# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| IN RE: NATIONAL HOCKEY LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION ) ) ) ) ) | MDL No. 14-2551 (SRN/BRT) |
| CHRISTOPHER SIMON, FREDERICK AHERN, PERRY ANDERSON, PAUL ANDREA, HARVEY BENNETT, SCOTT DANIELS, WILLIAM HARRIS, STEWART RANDALL HOLT, JAMES KRULICKI, GUILLAUME LATENDRESSE, CRAIG NORWICH AND GEORGE PESUT, ) ) ) ) ) ) ) ) ) ) | Case No. _____  CLASS ACTION COMPLAINT  Jury Trial Demanded |
| Plaintiffs, ) ) | |
| v. ) ) | |
| NATIONAL HOCKEY LEAGUE and NATIONAL HOCKEY LEAGUE BOARD OF GOVERNORS, (collectively, "NHL"), ) ) ) ) | |
| Defendants. ) | |

Plaintiffs, by and through multiple undersigned counsel, bring this Class Action Complaint against Defendant National Hockey League and its constituent entities, including, without limitation, NHL Enterprises, Inc., and the National Hockey League Board of Governors ("Board") (collectively "Defendant," "NHL," or "League") and, pursuant to Fed. R. Civ. P. 11(b), allege upon facts and information and belief, except for the allegations concerning each Plaintiffs' own actions, as follows.

## INTRODUCTION

1.     Former NHL players signed up to play hockey knowing that they might get injured and dinged, but they did not sign up for avoidable brain damage.  This action arises from the pathological and debilitating effects of brain injuries caused by concussive and sub-concussive impacts sustained by former NHL players during their professional careers.

2.     Every blow to the head is dangerous.  Both repeated concussions and sub-concussions cause permanent brain damage.  During practice and games, an NHL player can sustain close to one thousand or more hits to the head in one season without any documented incapacitating concussion.  Such repeated blows result in permanently-impaired brain function.

3.     Unbeknownst to Plaintiffs, scientific evidence has for decades linked head trauma to long-term neurological problems.

4.     NHL knew or should have known of this scientific evidence and its compelling conclusion that persons who sustain repetitive concussive events, sub-concussive events, and/or other brain injuries are at significantly greater risk for

chronic neuro-cognitive and neuro-degenerative illness and disabilities both during their hockey careers and, especially, later in life.

5.     Although the NHL knew or should have known, as the Plaintiffs did not, about this scientific evidence concerning concussions, sub-concussive impacts, and brain injuries, the NHL never told Plaintiffs about the long-term dangers of repeated brain trauma.

6.     Eighty-five years ago, pathologist Harrison Martland published his seminal study in the *Journal of the American Medical Association* linking sub-concussive blows suffered by boxers to injuries ranging from mild concussions to degenerative brain disease.

7.     Scientists and doctors in the United States and across the world have since published scores of peer-reviewed articles in well-established medical and scientific journals conclusively establishing the link between later-in-life brain diseases and sub-concussive/concussive blows suffered by, among others, hockey players.

8.     Despite this mounting evidence, for decades Defendant either took no steps to protect and educate its players or took insufficient steps to make players aware of the real risks of playing in the NHL, which would have protected players from unnecessary long-term effects of head trauma.

9.     Assuming a duty as a guardian against head trauma in players, the League instituted the helmet requirement in 1979.  Similarly acting in accord with its duty to the players, starting with the 1996-1997 season, the NHL created a concussion program (the "Concussion Program"), ostensibly to research and study brain injuries affecting NHL players.  Defendant, however, failed to discharge its assumed duty non-negligently.

3

Helmets do not protect against concussion, giving players a false sense of protection, and the Concussion Program served only to give the false impression that the NHL was providing players with accurate risk analysis.

10.     According to the Concussion Program's report, "NHL team physicians … were mandated by the league to document all concussions sustained during regular season games from 1997-1998 to 2003-2004" using "standardized injury report forms."

11.     In the 1996-1997 season, the first year of the Concussion Program, the NHL initiated baseline brain testing for its players and required its team doctors and trainers to maintain records of all players believed to have suffered concussions.   This data was then used to study concussions in the League from 1997 through 2004.

12.     During this study period, the NHL voluntarily inserted itself on behalf of the players into the scientific research and discussion concerning the link between brain injuries sustained by NHL players on the one hand, and long-term impairment and degeneration of the brain on the other, by publicly maintaining that the Concussion Program was analyzing the concussion data.   Yet the NHL took no action to reduce the number and severity of concussions among its players during that period and Plaintiffs relied on the NHL's silence to their detriment.

13.     By voluntarily inserting itself into this research and public discourse, the NHL confirmed its duty of care toward the players and voluntarily undertook a responsibility: (a) to cease glorifying the fist-fighting and violence that produces violent head trauma and, at the high price of player health, advances the NHL's financial and political interests; and (b) to inform all former players, and then-current players, of the

4

material facts concerning the risks of concussive events, sub-concussive events, and other brain injuries.

14.    Players and their families looked to the NHL for guidance on issues regarding player health and safety, including head injuries, and expected the NHL to intervene in matters of player safety, to recognize issues of player safety, and to be truthful on the issue of player safety.

15.    Having assumed a duty of care toward the players whose skill and dedication permitted the NHL to prosper, expand, and ultimately become the billions-a-year business it is today, and having voluntarily assumed a duty to investigate, study, and truthfully report to the NHL players, including the Plaintiffs, the medical risks associated with hockey and long-term brain diseases, the Concussion Program did nothing until 2011—fourteen years after it started—when it finally issued a report.  That report, however, discussed only the number of concussions in the NHL for the regular seasons from 1997-2004.  Listing nine specific study limitations, the report, fourteen years in the making, boiled down to a "more study is needed" dodge.

16.    Despite the mountain of evidence connecting hockey to brain injuries, NHL Commissioner Gary Bettman subsequently stated that more study on the issue is necessary. In short, the NHL chooses to avoid rigorous scientific study of the concussion issue, dodges even the implications of its own soft-pedaled and long-delayed report, and avoids grappling with the clear medical findings of other sports or the general practice of medicine regarding long-term brain diseases and head hits.

17.    Indeed, between 1996 and 2011, when the NHL was reportedly looking at the Concussion Program data, many NHL players were forced to prematurely retire due to the lingering effects caused by concussions received in the NHL.   Some of them include: 1996 – Brett Lindros and Dean Chynoweth; 1997 – Stanley Cup Champion Nick Kypreos and Dennis Vaske; 1998 – Hall of Famer Pat LaFontaine; 1999 – Stanley Cup Champions Geoff Courtnall and Jeff Beukeboom; 2001 – Olympian Peter Svoboda; 2002 – Gino "Chief" or "The Enforcer" Odjick; 2003 – Stanley Cup Champion and Hall of Famer Mike Richter; 2004 – Steve Moore, who suffered career-ending injuries when brutally attacked by Todd Bertuzzi, and Hall of Famer and Conn Smythe Trophy Winner Scott Stevens; 2005 – Olympian and Stanley Cup Champion Adam Deadmarsh; 2006 – All Star Keith Primeau; 2007 – Matthew Barnaby and perennial All-Star and Hart Memorial Trophy winner Eric Lindros; and 2011 – Stanley Cup Champion Marc Savard.

18.    Defendant's active and purposeful concealment of the severe long-term risks of brain injuries exposed players to unnecessary dangers they could have avoided had Defendant provided them with truthful and accurate information and taken appropriate action to prevent needless and avoidable harm.   Many of the players, including Plaintiffs, sustained repetitive brain injuries while in the NHL and now suffer from latent or manifest neuro-degenerative disorders and diseases, all of which, in whole or in part, were caused by Defendant's acts, omissions, or both.

19.    Defendant caused or contributed to the injuries and increased risks to Plaintiffs through its acts and omissions by, among other things: (a) historically ignoring the true risks of concussive events, sub-concussive events, and/or brain injuries suffered by

NHL hockey players; (b) failing to disclose the true risks of repetitive brain injuries to NHL players; (c) refusing meaningfully to address the issue of brain injuries despite a large body of medical opinion reaching back to the early 20th Century establishing such a linkage and their own study of the issue; and (d) refusing to cease their patent glorification of, and profiting from, fist-fighting and violence in the League, notwithstanding the uniqueness of such conduct to the NHL compared to other hockey leagues, and the purposeless of fighting to winning the game.

20.    Defendant persists in this conduct to date by, among other things, continuing to promote violence and bare-knuckle fist fighting.  Defendant's acceptance of and profiting from violence and cranial mayhem stands in stark contrast to Olympics and National Collegiate Athletics Association ("NCAA") hockey, where fighting is not promoted and does not take place.

21.    The time has come for the NHL not only to care for those former players on whose backs and brains the League reaped billions of dollars, but also finally to put long-term player safety over profit and demonstrably dangerous tradition, especially as neither the NHL nor the game will suffer as a result.   To quote the legendary Ken Dryden, former All-Star goalie for the Montreal Canadiens, six-time Stanley Cup champion, former president of the Toronto Maple Leafs, former member of the Canadian Parliament, and NHL Hall of Famer: "Lose fighting, and you lose the fight in the game?  No, it's the reverse."   Dryden also stated, "The model for an NHL without fighting is right there in front of us … the playoffs," in which "enforcers don't play [because] teams and coaches can't afford anything stupid and unpredictable" and players play their best, cleanest

hockey. *See* Ken Dryden, *Case for Fighting in Hockey Continues to Get Weaker and Weaker*, Globe & Mail, Nov. 2, 2013.

22.     Indeed, quite recently, Mike Milbury, a former 12-year NHLer and current NHL game analyst for NBC Sports, was asked what he thought about the fact that there were fewer enforcers in the game than before. The entire hockey world took note of Milbury's response: "It's telling me it's time to get rid of fighting. It's telling me it's over. As much as I liked a good scrap in my day, there are too many issues here involving concussions, too many problems. Teams are going away from it. Let's grow up and get rid of it." *See* Greg Wyshynski, *Mike Milbury says it's time to 'grow up' and ban fighting*, Yahoo! Sports, Oct. 8, 2014, http://sports.yahoo.com/blogs/nhl-puck-daddy/mike-milbury-says-it-s-time-to--grow-up--and-ban-fighting--video-034233669.html.

## JURISDICTION AND VENUE

23.     This Court has original jurisdiction pursuant to 28 U.S.C. § 1332(d)(2) because the proposed class consists of more than one hundred persons, the overall amount in controversy exceeds $5,000,000 exclusive of interest, costs, and attorney's fees, and at least one Plaintiff is a citizen of a State different from one Defendant. The claims can be tried jointly in that they involve common questions of law and fact.

24.     This Court has personal jurisdiction over the Defendant because it conducts substantial and continuous business in the state of Minnesota.

25.     Venue is proper in this district pursuant to 28 U.S.C. §1391(a) and (b) because a substantial part of the events or omissions that give rise to the claims occurred within the state of Minnesota and this District, the Defendant conducts a substantial part of

its business within this District, and the Judicial Panel on Multi-District Litigation has consolidated and transferred these cases to this Court.

## PARTIES

### I.    PLAINTIFFS HAVE BEEN HARMED

#### A.    Christopher Simon

26.    Plaintiff Christopher Simon is forty-five years old and a resident of Ontario, Canada.

27.    Mr. Simon played in the NHL from 1990 through 2008.   Mr. Simon played from 1992-1995 for the Quebec Nordiques; from 1995-1996 for the Colorado Avalanche; from 1996-2002 for the Washington Capitals; from 2002-2003 for the Washington Capitals and the Chicago Blackhawks; from 2003-2004 for the New York Rangers and the Calgary Flames; from 2005-2006 for the Calgary Flames; from 2006-2007 for the New York Islanders; and from 2007-2008 for the New York Islanders and the Minnesota Wild.

28.    During his NHL career, Mr. Simon was involved in approximately one hundred and eleven (111) hockey fights.

29.    Mr. Simon suffered multiple serious head traumas during his NHL career that were improperly diagnosed and treated.

30.    Mr. Simon was, has been, and will continue to be damaged as a direct and proximate result of the NHL's misconduct further described herein.   Among other things, Mr. Simon continues to suffer on a daily basis from chronic headaches, depression, sleeplessness, dizziness, memory loss, neurocognitive disorder, irritability and anxiousness, numbness in neck, ringing of the ears, and post-traumatic stress disorder.

31.    Due to the injuries he suffered while playing in the NHL, Mr. Simon is at an increased risk of future harm from developing serious, latent neurodegenerative disorders and diseases including but not limited to CTE, dementia, Alzheimer's disease, or similar cognitive-impairing conditions.

32.    The NHL never properly warned Mr. Simon regarding the long-term neurological risks of suffering repeated blows to the head while on the ice.

**B.    Frederick Ahern**

33.    Plaintiff Frederick Ahern is sixty-five years old and a resident and citizen of the state of Massachusetts.

34.    Mr. Ahern played in the NHL from 1974 through 1978.   Mr. Ahern played from 1974-1976 with the California Golden Seals; from 1976-1977 with the Cleveland Barons; and from 1977-1978 with the Cleveland Barons and the Colorado Rockies.

35.    During his NHL career, Mr. Ahern was involved in approximately five (5) hockey fights.

36.    Mr. Ahern suffered multiple serious head traumas during his NHL career that were improperly diagnosed and treated.

37.    Mr. Ahern was, has been, and will continue to be damaged as a direct and proximate result of the NHL's misconduct further described herein.   Among other things, Mr. Ahern continues to suffer on a daily basis from depression, dizziness, and anxiety.

38.    Due to the injuries he suffered while playing in the NHL, Mr. Ahern is at an increased risk of future harm from developing serious, latent neurodegenerative disorders

and diseases including but not limited to CTE, dementia, Alzheimer's disease, or similar cognitive-impairing conditions

39.    The NHL never properly warned Mr. Ahern regarding the long-term neurological risks of suffering repeated blows to the head while on the ice.

**C.    Perry Anderson**

40.    Plaintiff Perry Anderson is fifty-five years old and a resident and citizen of Arizona.

41.    Mr. Anderson played in the NHL from 1980 through 1992.  Mr. Anderson played from 1981-1985 for the St. Louis Blues; from 1985-1991 for the New Jersey Devils; and from 1991-1992 for the San Jose Sharks.

42.    During his NHL career, Mr. Anderson was involved in approximately eighty-seven (87) hockey fights.

43.    Mr. Anderson suffered multiple serious head traumas during his NHL career that were improperly diagnosed and treated.

44.    Mr. Anderson was, has been, and will continue to be damaged as a direct and proximate result of the NHL's misconduct further described herein.   Among other things, Mr. Anderson continues to suffer on a daily basis from depression, sleeplessness, dizziness, memory loss, impulse control, neurocognitive disorder, irritability/anxiousness, numbness in calves and feet, anger issues, and hearing loss.

45.    Due to the injuries he suffered while playing in the NHL, Mr. Anderson is at an increased risk of future harm from developing serious, latent neurodegenerative

disorders and diseases including but not limited to CTE, dementia, Alzheimer's disease, or similar cognitive-impairing conditions.

46.     The NHL never properly warned Mr. Anderson regarding the long-term neurological risks of suffering repeated blows to the head while on the ice.

**D.     Paul Andrea**

47.     Plaintiff Paul Andrea is seventy-five years old and a resident of Nova Scotia, Canada.

48.     Mr. Andrea played in the NHL from 1965 through 1971.  Mr. Andrea played from 1965-1966 for the New York Rangers; from 1967-1969 for the Pittsburgh Penguins; and from 1970-1971 for the California Golden Seals and the Buffalo Sabres.

49.     Mr. Andrea suffered multiple serious head traumas during his NHL career that were improperly diagnosed and treated.

50.     Mr. Andrea was, has been, and will continue to be damaged as a direct and proximate result of the NHL's misconduct further described herein.   Among other things, Mr. Andrea continues to suffer on a daily basis from depression, sleeplessness, dizziness, memory loss, impulse control, neurocognitive disorder, irritability/anxiousness, numbness in calves and feet, anger issues, and ringing of the ears.

51.     Due to the injuries he suffered while playing in the NHL, Mr. Andrea is at an increased risk of future harm from developing serious, latent neurodegenerative disorders and diseases including but not limited to CTE, dementia, Alzheimer's disease, or similar cognitive-impairing conditions

52.     The NHL never properly warned Mr. Andrea regarding the long-term neurological risks of suffering repeated blows to the head while on the ice.

**E.     Harvey Bennett**

53.     Plaintiff Harvey Bennett is sixty-five years old and a resident and citizen of Rhode Island.

54.     Mr. Bennett played in the NHL from 1974 through 1979.  Mr. Bennett played from 1974-1975 for the Pittsburgh Penguins; 1975-1976 for the Pittsburgh Penguins and Washington Capitals; 1976-1977 for the Washington Capitals and Philadelphia Flyers; 1977-1978 for Philadelphia Flyers and Minnesota North Stars; and 1978-1979 for the St. Louis Blues.

55.     During his NHL career, Mr. Bennett was involved in approximately eighteen (18) hockey fights.

56.     Mr. Bennett suffered multiple serious head traumas during his NHL career that were improperly diagnosed and treated.

57.     Mr. Bennett was, has been, and will continue to be damaged as a direct and proximate result of the NHL's misconduct further described herein.   Among other things, Mr. Bennett continues to suffer on a daily basis from sleeplessness, dizziness, memory loss, and irritability/anxiousness.

58.     Due to the injuries he suffered while playing in the NHL, Mr. Bennett is at an increased risk of future harm from developing serious, latent neurodegenerative disorders and diseases including but not limited to CTE, dementia, Alzheimer's disease, or similar cognitive-impairing conditions

59.     The NHL never properly warned Mr. Bennett regarding the long-term neurological risks of suffering repeated blows to the head while on the ice.

**F.    Scott Daniels**

60.     Plaintiff Scott Daniels is forty-seven years old and is a resident and citizen of Massachusetts.

61.     Mr. Daniels played in the NHL from 1992 through 1999.  Mr. Daniels played from 1992-1996 for the Hartford Whalers; from 1996-1997 for the Philadelphia Flyers; and 1997-1999 for the New Jersey Devils.

62.     During his NHL career, Mr. Daniels was involved in approximately sixty-four (64) hockey fights.

63.     Mr. Daniels suffered multiple serious head traumas during his NHL career that were improperly diagnosed and treated.

64.     Mr. Daniels was, has been, and will continue to be damaged as a direct and proximate result of the NHL's misconduct further described herein.   Among other things, Mr. Daniels continues to suffer on a daily basis from tremors in both hands, headaches, sleep disorder, memory loss, cognitive and executive dysfunction, and mood and behavioral disorders.

65.     Due to the injuries he suffered while playing in the NHL, Mr. Daniels is at an increased risk of future harm from developing serious, latent neurodegenerative disorders and diseases including but not limited to CTE, dementia, Parkinsonism, Alzheimer's disease, or similar cognitive-impairing conditions

66.    The NHL never properly warned Mr. Daniels regarding the long-term neurological risks of suffering repeated blows to the head while on the ice.

**G.    William Harris**

67.    Plaintiff William Harris is sixty-five years old and has dual citizenship in the United States of America and Canada, and is a resident of Ontario, Canada.

68.    Mr. Harris played in the NHL from 1974 through 1984. Mr. Harris played from 1972-1979 for the New York Islanders; from 1979-1980 for the New York Islanders and the Los Angeles Kings; from 1981-1982 for the Los Angeles Kings and the Toronto Maple Leafs; from 1982-1983 for the Toronto Maple Leafs; and from 1983-1984 for the Toronto Maple Leafs and the Los Angeles Kings.

69.    During his NHL career, Mr. Harris was involved in at least one (1) hockey fight.

70.    Mr. Harris suffered multiple serious head traumas during his NHL career that were improperly diagnosed and treated.

71.    Mr. Harris was, has been, and will continue to be damaged as a direct and proximate result of the NHL's misconduct further described herein. Among other things, Mr. Harris continues to suffer on a daily basis from headaches, anxiety, fear, forgetfulness, insomnia, and impaired gait.

72.    Due to the injuries he suffered while playing in the NHL, Mr. Harris is at an increased risk of future harm from developing serious, latent neurodegenerative disorders and diseases including but not limited to CTE, dementia, Alzheimer's disease, or similar cognitive-impairing conditions

73.    The NHL never properly warned Mr. Harris regarding the long-term neurological risks of suffering repeated blows to the head while on the ice.

### H.    Stewart Randall Holt

74.    Plaintiff Stewart Randall Holt is sixty-four years old and a resident of Alberta, Canada.

75.    Mr. Holt played in the NHL from 1974 through 1984.   Mr. Holt played from 1974-1977 for the Chicago Blackhawks; from 1977-1978 for the Chicago Blackhawks and the Cleveland Barons; from 1978-1979 for the Vancouver Canucks and the Los Angeles Kings; from 1979-1980 for the Los Angeles Kings; from 1980-1981 for the Calgary Flames; 1981-1982 for the Calgary Flames and the Washington Capitals; from 1982-1983 for the Washington Capitals; and 1983-1984 for the Philadelphia Flyers.

76.    During his NHL career, Mr. Holt was involved in approximately seventy-two (72) hockey fights.

77.    Mr. Holt suffered multiple serious head traumas during his NHL career that were improperly diagnosed and treated.

78.    Mr. Holt was, has been, and will continue to be damaged as a direct and proximate result of the NHL's misconduct further described herein.   Among other things, Mr. Holt continues to suffer from a dangerous short temper, memory loss, anxiety, and depression.

79.    Due to the injuries he suffered while playing in the NHL, Mr. Holt is at an increased risk of future harm from developing serious, latent neurodegenerative disorders

and diseases including but not limited to CTE, dementia, Alzheimer's disease, or similar cognitive-impairing conditions.

80.     The NHL never properly warned Mr. Holt regarding the long-term neurological risks of suffering repeated blows to the head while on the ice.

**I.     James Krulicki**

81.     Plaintiff James Krulicki is sixty-nine years old and a resident of Ontario, Canada.

82.     Mr. Krulicki played for the New York Rangers and Detroit Red Wings from 1970-1971.

83.     Mr. Krulicki suffered multiple serious head traumas during his NHL career that were improperly diagnosed and treated.

84.     Mr. Krulicki was, has been, and will continue to be damaged as a direct and proximate result of the NHL's misconduct further described herein.   Among other things, Mr. Krulicki continues to suffer from mood swings, loss of judgment, loss of decision making, loss of multitasking, disinhibition, impulsivity, change of personality, loss of attention shifting, loss of planning capabilities and loss of awareness and insight regarding his own condition, and was diagnosed with Frontotemporal Lobar Degeneration; Probable Behavior Variant Frontotemporal Dementia, and idiopathic focal dystonia.

85.     Due to the injuries he suffered while playing in the NHL, Mr. Krulicki is at an increased risk of future harm from developing serious, latent neurodegenerative disorders and diseases including but not limited to CTE, Alzheimer's disease, or similar cognitive-impairing conditions

17

86.     The NHL never properly warned Mr. Krulicki regarding the long-term neurological risks of suffering repeated blows to the head while on the ice.

**J.     Guillaume Latendresse**

87.     Plaintiff Guillaume Latendresse is twenty-nine years old and a resident of Quebec, Canada.

88.     Mr. Latendresse played in the NHL from 2006 through 2013.    Mr. Latendresse played from 2006-2009 for the Montreal Canadiens; from 2009-2010 for the Montreal Canadiens and the Minnesota Wild; from 2010-2012 for the Minnesota Wild; and from 2012-2013 for the Ottawa Senators.

89.     During his NHL career, Mr. Latendresse was involved in approximately seventeen (17) hockey fights.

90.     Mr. Latendresse suffered multiple serious head traumas during his NHL career that were improperly diagnosed and treated.

91.     Mr. Latendresse was, has been, and will continue to be damaged as a direct and proximate result of the NHL's misconduct further described herein.   Among other things, Mr. Latendresse continues to suffer on a daily basis from headaches, irritability, mood changes, anxiety, and stress gestion.

92.     Due to the injuries he suffered while playing in the NHL, Mr. Latendresse is at an increased risk of future harm from developing serious, latent neurodegenerative disorders and diseases including but not limited to CTE, dementia, Alzheimer's disease, or similar cognitive-impairing conditions

93.     The NHL never properly warned Mr. Latendresse regarding the long-term neurological risks of suffering repeated blows to the head while on the ice.

**K.     Craig Norwich**

94.     Plaintiff Craig Norwich is sixty-one years old and a resident and citizen of Minnesota.

95.     Mr. Norwich played in the NHL from 1979 through 1981.  Mr. Norwich played from 1979-1980 for the Winnipeg Jets; and from 1980-1981 for the St. Louis Blues and the Colorado Rockies.

96.     Mr. Norwich suffered multiple serious head traumas during his NHL career that were improperly diagnosed and treated.

97.     Mr. Norwich was, has been, and will continue to be damaged as a direct and proximate result of the NHL's misconduct further described herein.   Among other things, Mr. Norwich continues to suffer on a daily basis from blurry vision, depression, sleeplessness, memory loss, irritability/anxiousness, and anger issues.

98.     Due to the injuries he suffered while playing in the NHL, Mr. Norwich is at an increased risk of future harm from developing serious, latent neurodegenerative disorders and diseases including but not limited to CTE, dementia, Alzheimer's disease, or similar cognitive-impairing conditions

99.     The NHL never properly warned Mr. Norwich regarding the long-term neurological risks of suffering repeated blows to the head while on the ice.

### L. George Pesut

100.    Plaintiff George Pesut is sixty-three years old and a resident of British Columbia, Canada.

101.    Mr. Pesut played in the NHL from 1974 through 1976.   Mr. Pesut played his entire NHL career for the California Golden Seals.

102.    During his NHL career, it is reported that Mr. Pesut was involved in approximately six (6) hockey fights but he recalls being involved in more than six fights.

103.    Mr. Pesut suffered multiple serious head traumas during his NHL career that were improperly diagnosed and treated.

104.    Mr. Pesut was, has been, and will continue to be damaged as a direct and proximate result of the NHL's misconduct further described herein.   Due to the injuries he suffered while playing in the NHL, Mr. Pesut is at an increased risk of future harm from developing serious, latent neurodegenerative disorders and diseases including but not limited to CTE, dementia, Alzheimer's disease, or similar cognitive-impairing conditions

105.    The NHL never properly warned Mr. Pesut regarding the long-term neurological risks of suffering repeated blows to the head while on the ice.

## II.    Breach and Causation Allegations Applicable to Plaintiffs Simon, Ahern, Anderson, Andrea, Bennett, Daniels, Harris, Holt, Krulicki, Latendresse, Norwich, and Pesut.

106.    At no time during their NHL careers did any NHL personnel advise these players, generally or specifically, of the negative long-term effects of sustaining concussions and sub-concussive blows to the head, including the risks of repeat concussions and sub-concussive blows.

107. At no time during their NHL careers did any NHL personnel advise these players, generally or specifically, of the negative long-term effects of sustaining concussions and sub-concussive blows to the head, including the risks of repeat concussions and sub-concussive blows.

108. Plaintiffs had no familiarity with or reason to access any medical literature concerning concussions, mild traumatic brain injuries, or other sub-concussive impacts.

109. Never having been advised about the negative, long-term effects of sustaining concussions, and with no knowledge of the medical literature concerning concussions, mild traumatic brain injuries, or other sub-concussive impacts, Plaintiffs were never on notice that they needed to try to find, and understand, such information.

110. Plaintiffs looked to the NHL, the controlling organization, which prospered because of the skill and dedication of Plaintiffs and class members, for information about health and safety.

111. With the NHL silent about the risks, dangers, and serious long-term effects of concussions and sub-concussive impacts, and silent about the need for proper treatment, evaluation, and conservative return-to-play protocols, Plaintiffs reasonably believed that going right back to games and practices was safe despite having suffered such blows to the head.

112. In light of the NHL's power over the game and players, the NHL's fortunes being directly dependent on the players whose ability filled arenas and generated TV revenues, and the NHL's superior ability to gather and understand information about concussions and sub-concussive impacts, Plaintiffs reasonably relied on the NHL's silence

about concussions in continuing to believe concussions were nothing more than temporary "dings" or commonplace "getting your bell rung" episodes.

113.    Plaintiffs reasonably relied upon the NHL's silence concerning concussions, sub-concussive impacts, and other head injuries to conclude that it was safe to continue playing after such injuries, even if their symptoms had not resolved.

114.    Plaintiffs did not know and had no reason to know that continuing to practice and play after concussions and other head hits substantially increased the risks of the occurrence and severity of serious neurological symptoms and illnesses.

115.    Plaintiffs reasonably relied on the League for information about safety and health.   Among other things, the League negotiated the television contracts that generated much of the NHL's revenues, and that depended, in turn, on the skill and dedication of Plaintiffs and class members.

116.    With the NHL's fortunes and the jobs and salaries of the NHL executives dependent on the players on the ice, Plaintiffs reasonably relied on the NHL to inform them and class members about the substantially increased health risks to which the players unwittingly subjected themselves.

117.    A hit to the head, no matter how violent, was, in League parlance, simply "a ding" or "getting your bell rung."   Despite the many concussions players experienced, the NHL gave no warnings to the players on whom the NHL depended for its success.   Nor did the NHL ever implement procedures requiring players to sit out and obtain proper evaluations, treatments, clearances, and advice before returning to action.

118.    In light of the relationship between the League and its players, Plaintiffs reasonably understood the NHL's silence on the question of concussions as meaning that continuing to play after a concussion or violent head hit, whether in the same game or the next one, was safe.

119.    Had the NHL given Plaintiffs information about the increased danger to which they subjected themselves by continuing to play after concussions and head hits, or at least told players that such information existed, Plaintiffs would have ensured that they received appropriate medical treatment and made sure they had recovered before returning to practices and games.

## III.    THE STATUTE OF LIMITATIONS IS TOLLED

### A.    NHL'S Duty to Plaintiffs Underscores Propriety of Equitable Tolling

120.    The NHL undertook a duty of care to Plaintiffs.  The NHL's fortunes depended entirely on the skill, dedication, and courage of the League's players, such as Plaintiffs.  Filling arenas with fans, generating licensing revenue through consumer products bearing player names and likenesses, driving the ever-increasing League revenues from TV contracts the League negotiated, the players and their popularity were the NHL's primary asset.

121.    The NHL had vastly greater resources than Plaintiffs to obtain, analyze, and disseminate information about the dangers of concussions and head hits.

122.    Knowing that the League's fortunes depended on their play, Plaintiffs reasonably relied on the NHL to inform them about safety and health information.

123.   Plaintiffs reasonably relied on what NHL effectively said – "Concussions are just 'dings'" or "a little bell ringing" and "It's okay to go right back out on the ice after sustaining one."

124.   Plaintiffs reasonably acted on what the NHL omitted—that concussions and sub-concussive hits are a big deal, and you should not go back to play or practice until you have been properly evaluated, treated, and cleared to play because the risks of permanent damage are enormous—in returning to play immediately after taking brutal hits to the head, even after getting knocked out cold and being revived with smelling salts.

125.   As a result of the NHL's special relationship with, assumed duty of care toward, voluntary undertaking of the Concussion Program, and superior knowledge about the causes, frequency, severity and proper treatment of concussions, mild traumatic brain injuries ("MTBI"), and other sub-concussive injuries and head trauma, Plaintiffs reposed trust and confidence in the NHL.

126.   In light of the NHL's duty of care toward the Plaintiffs, the NHL's silence about the dangers of concussions, MTBI, and other head injuries suffices to toll any limitations or repose periods.

127.   Beyond mere silence, the League affirmatively concealed facts required to put Plaintiffs on notice of their claims.

128.   To that end, during the seven years (1997-2004) during which the Concussion Program was underway, the NHL never told its players they might be at any increased risks from concussions.   Nor did the NHL tell its players that their head injuries

would expose them to the devastating sequelae of post-concussion syndrome, CTE, or other neurocognitive impairments in later life.

129.    The NHL's silence about the dangers of concussions, sub-concussive impacts, and head trauma in the decades preceding the Concussion Program, and the NHL's continued silence about those dangers during the 1997-2011 Concussion Program, induced Plaintiffs' reasonable belief that they were not at any particular risk for post-retirement brain injuries and neurocognitive deficits.

130.    The NHL's seven-year delay in publishing the Concussion Program report further induced players not to perceive any increased risk or think they might need to investigate whether they might have claims against the NHL.

131.    Trusting the NHL to advise them of health issues and warn them of risks, Plaintiffs reasonably relied on the NHL's second seven-year silence to publish the Concussion Program report as meaning that no reason existed to question whether they might have claims against the NHL, or to investigate underlying facts.   Plaintiffs, trusting the League, reasonably believed that the League would disclose news relevant to their health.

132.    Even when at long last the NHL finally disclosed the Concussion Program report, it said nothing about MTBI and simply stated that "more study is needed."

133.    Fourteen years in the making, the Concussion Program report did not put Plaintiffs on notice that they had or should investigate the factual bases for any claims against the League.

134.    According to the 2011 report, team physicians reported 559 concussions during regular season games.  The estimated incidence was 1.8 concussions per 1000 player-hours and an alarming 5.8 concussions per 100 players per season.

135.    The 2011 report also found that almost 20% of players returned to play during the same game in which they suffered the concussion, and in nearly 10% of cases they returned to play after seeing a team physician.   Unquestionably, the same or worse conduct toward the players by the NHL occurred for decades before the Concussion Program began in 1997.

136.    The 2011 report included the following findings that directly relate to how the symptoms and circumstances of concussions contribute to health risks:

(a)    Several symptoms "were found to be significant predictors of time loss (headache, low energy or fatigue, amnesia, and abnormal neurologic examination). These findings are of use to physicians, medical support staff, players, coaches and management, given that they have prognostic utility for assessing concussion severity at the time of injury."

(b)    "Time loss significantly increased for every subsequent (repeat) concussion sustained during the study period, as well as for each increase in the number of post-concussion symptoms experienced."

(c)    "In 27% percent of instances of concussion in which the player continued to play without game-time medical evaluation, more than 10 days of time loss resulted . . . . It is becoming more apparent that athletes with acute concussion experience functional or cognitive impairment and reduced reaction times.   It is possible that continued exertion in the immediate post-concussion period may exacerbate the injury or increase a player's susceptibility to further injury, which may ultimately increase severity and prolong recovery."

137.    Despite these findings, though, the report quickly sought to downplay their significance, concluding with the mealy-mouthed assurance that, essentially, no cause and

effect relationship could be found between concussions and long-term neurological problems: "[The] results suggest that more could be done to educate all involved with the sport about the potential adverse effects associated with continuing to play while symptomatic, failing to report symptoms to medical staff and failure to recognize or evaluate any suspected concussion."

138.    Avoiding any clear findings, the Concussion Program report, after fourteen years and despite an abundance of developing scientific and medical literature about head hits and concussions, found only "*potential* adverse effects" from "continuing to play while symptomatic, failing to report symptoms to medical staff and failure to recognize or evaluate any suspected concussion."

139.    Soft-pedaling the problem still further, the report said only that its "findings *suggest* that more conservative or precautionary measures should be taken in the immediate post-concussion period, particularly when an athlete reports or experiences a post-concussion headache, low energy or fatigue, amnesia, recurrent concussion or many different post-concussion symptoms, or when the athlete has an abnormal neurologic examination" (emphasis added).    "Suggest" is a long way from "conclude" or "demonstrate"—in short, another NHL assurance that concussions were just not a big worry for players.

140.    Equally important, the report did not conclude that players were at increased risk of brain injuries and neurocognitive impairment as a result of head hits while playing.

141.    Nor did the report put Plaintiffs on notice that the forgetfulness, mood swings, difficulties concentrating, and other signs of what retired players chalked up to

"aging" was in fact the result of concussions and other head injuries they suffered while playing.

142.    All the report concluded, essentially, was that more education was needed about *potential* adverse effects.   That does not suffice to put retired players on notice that they might possibly have claims against the NHL, particularly when the report did not link concussions and head injuries to the League's own ongoing culture encouragement of violent play.

143.    The Concussion Program and its belated report were also not independent. Brian Benson was the "principal investigator" for the Concussion Program's report and "takes responsibility for the integrity of the data and accuracy of the data analysis."

144.    Mr. Benson "contributed to the analysis of the data," while another contributor, Jian Kang "was responsible for technical aspects of the data analysis and participated in data interpretation."

145.    Mr. Benson, with Jian Kang, "contributed to the drafting of the manuscript."

146.    Disclosing "competing interests," the Concussion Program's report states: "Brian Benson is on contract with the NHL as a concussion data analyst and publication consultant."   Another author, Willem H. Meeuwisse, is described as "a medical consultant for the National Hockey League (NHL)."   Another contributor, Charles Burke, "is a team physician for the Pittsburgh Penguins NHL club."   Of the remaining two contributors, John Rizos, who "had full access to all of the data" and "critically reviewed" the report manuscript, "is a medical consultant for the NHL Players' Association," and Jian Kang is not shown to have any competing interests.

147.    Even today, the League's stock response to concussion questions boils down to:  "We need more data, more research, we cannot say anything conclusive."   In the face of the concussion data from the lawsuit against the National Football League ("NFL"), which the NFL itself, after a similarly long and studied silence, admits shows that *one in three retired NFL players* will develop brain and neurocognitive problems, the NHL's response would be laughable were it not so tragic.  For present purposes, though, that response confirms the NHL's unwavering failure to say or do anything that would have put Plaintiffs on notice that they should investigate claims.

148.    Plaintiffs reasonably relied on the NHL to inform them about the risks of concussions, MTBI, and other sub-concussive injuries and head trauma.   With no material information ever forthcoming, Plaintiffs had no reason to dig for information they reasonably believed the NHL would share if it existed.

**B.    Plaintiffs' Special Susceptibility to Reliance on NHL for Information**

149.    Plaintiffs' reliance on the NHL for information about concussions and other head injuries was not just reasonable but foreseeable to the NHL.

150.    Hockey players, no differently from anyone else, grow up believing that medical personnel, such as League medical directors, supervisors, doctors, and trainers, put the patient-players' interests first and foremost.   Cleared to play immediately after getting knocked out—such as Rangers goalie and putative class member Gilles Gratton was in a 1976-1977 season game against the Bruins, having been propped up, administered smelling salts, and told "you're good to go" without even a rest on the bench—players believed they were, in fact, "good to go" and not doing any lasting harm to themselves:

151.    Given the go-ahead by NHL-approved doctors and trainers at rinks home and away, players went right back onto the ice after hard head hits, figuring that, of course, the NHL-sanctioned say-so had to be true.

152.    The NHL collects and keeps data on every player, from birthdate to educational background, to playing history to contract history, to injury and retirement data.

153.    The NHL knew that many of the Plaintiffs had little education past high school, having focused their energies almost exclusively on hockey from a very young age to reach the NHL.

154.    In 1999-2000, only 20% of NHL players had played college hockey.  In 2013-2014, 31% of the NHL's players had played college hockey.  Both percentages, small as they are, do **not** represent four-year degree earners, simply NHLers who played some college hockey.

155.    Dedicated so completely to hockey, the vast majority of NHL players naturally relied on the League, with its cadre of highly educated managerial, legal, and medical personnel, to disclose important medical risks.

156.    The NHL had access to the boxing, football, and other concussion studies described herein.   With the NHL's resources and highly-educated managerial, legal, and medical staff, it was uniquely positioned to inform NHL players of the increased risks those NFL and other concussion studies clearly demonstrate.

157.    But the NHL never told its players that these other studies demonstrate an increased risk for NHL players, or had any implications for NHL players.

158.    Knowing that the NHL had far greater information and was much more advantageously positioned to obtain information about the causes, prevention, and treatment of concussions and other head injuries, Plaintiffs reasonably relied on the NHL to inform them fully and promptly about material information.

159.    In refusing for decades to properly diagnose and treat concussions suffered by its players, the NHL misled Plaintiffs into believing that returning quickly to play, often in the same game in which they were concussed or otherwise "had their bells rung," was safe, posing neither short-term nor long-term dangers of brain injury and neurocognitive impairment.

160.    From the time they are mites, at the lowest rung of organized hockey, through the tiers of youth hockey, the progressions from high school and junior hockey to the minor professional leagues and, finally, to the NHL, players are taught to trust their coaches and team personnel and League personnel who administer and run the games.

161.    Based on a history of having been taught and having deeply absorbed the principle that League personnel and team coaches, doctors, and trainers know what is best and their word could be trusted, Plaintiffs were highly susceptible to relying, and reasonably did rely, on what the NHL did not say:    that a concussion or any head impact was extremely serious, should be avoided, and required very careful evaluation and treatment before a player should return to playing, whether in the same game or in the same season.

162.    Apart from the hockey culture that deeply inculcates in players a trust and confidence in their leagues and team personnel, the NHL understands the inherent

coerciveness that made Plaintiffs particularly susceptible to rely on the NHL's silence about the concussion and head injury risks the players were taking.

163.    The League knows that the minor and junior leagues are full of talented players desperately eager to reach the NHL.

164.    The League also knows full well that, upon reaching the NHL—the Holy Grail for any serious hockey player—a player wants to remain there.

165.    Not informing these players, highly competitive people to begin with, that they risk serious and possibly permanent and disabling brain injuries or cognitive problems if they suffer concussion or continue to play after suffering a head hit, the League knew, or surely should have known, the players would understand that silence as affirmation that they not only could but should play in a violent manner and continue to play after a head injury, and that doing so posed no danger to their health.

166.    At no time, including during the seven-year Concussion Program and in the following seven-year silence before publishing the Program's report, did the NHL warn players that the data suggested, at a minimum, that greater attention to concussions and head injuries was necessary, that it was possible that playing in the same game or soon after a head injury was potentially dangerous, or any other such warning.

167.    The League also knew that effects of concussions, sub-concussive impacts, and other head injuries are frequently latent, developing and manifesting themselves only after a player's NHL career has ended.

168.    The League regularly collects game injury reports, becoming the repository of substantial concussion and other head injury information.

169.    The League's Office of Player Safety also obtains detailed information about player brain and head injuries, often considering the severity of an injury in meting out punishments.  For example, in February 2012, the League's Vice President for Player Safety, Brendan Shanahan, had this to say after reviewing a head hit from Ottawa Senator Kyle Turris on Boston Bruin Joe Corvo:  "After reviewing the video extensively as we heard Turris's explanation of how the play developed, we concluded that the head was not targeted intentionally or even recklessly and that the circumstances surrounding the hit contributed significantly to the amount of head contact that resulted."

170.    Shanahan admitted that whether an injury occurs plays a role in the meting out of discipline.

171.    With the League playing a central role in collecting concussion and head injury information, and in monitoring head hits, Plaintiffs had further reason to believe that the League's silence about the extent and severity of potential concussion and head injury risks meant that continuing to play was safe, exposing them to no particular long-term danger.

172.    With the League involving itself in head injury data and discipline, the Plaintiffs reasonably believed that the League's silence meant safety—continuing to play was naturally not conceived of as a threat to health.

173.    Reasonably relying on the League for information, and knowing the League was monitoring and keeping data for head hits, Plaintiffs reasonably believed that the League would disclose to them any information material to their health, especially their neurocognitive well-being.

174.    In reasonably reposing trust and confidence in the NHL, with its superior information and its direct involvement in monitoring and evaluating head hits, Plaintiffs reasonably relied on the NHL's silence concerning the short and long-term dangers of concussions.

175.    Nothing the League said or did put Plaintiffs on notice that the League was sitting on information that could serve as the basis for Plaintiffs' claims or that Plaintiffs had any need to try to find and interpret such information.

176.    Because the League assumed a duty of care to Plaintiffs, assuming duties of protection and disclosure while knowing Plaintiffs trusted and relied on the League to provide any important information to them, and because the results of brain and head injuries are often slow to develop and easily mistaken for deficits accompanying simple aging, Plaintiffs were not on notice that they should investigate possible claims.

177.    Even players who received medical treatment in retirement for post-concussion syndrome or related maladies did not know that the League contemporaneously had information about concussions material to player decisions to continue playing.

178.    In the course of its business, with numerous financial, reputational, and legal reasons not to disclose what it long knew—that NHL players were at serious risk from the concussions and other head injuries they sustained while playing—the NHL remained silent about material key facts about the causes and effects of head injuries, preventing Plaintiffs from discovering a link between their NHL playing days and their brain and cognitive maladies today.

179.    Defendant was under, but breached, a continuing duty to disclose the true character, quality, and nature of the after-effects of concussive events, sub-concussive events, and/or brain injuries.  Because Defendant concealed the true character, quality, and nature of these injuries, it is estopped from relying on any statute of limitations defense.

180.    The applicable statute of limitations is tolled because Defendant's fraudulent concealment of the dangers and adverse effects of head injuries prevented Plaintiffs from learning of or properly appreciating the hazards to their health.

## IV.    DEFENDANT IS A RESIDENT OF THIS JUDICIAL DISTRICT

181.    Defendant NHL, which maintains its offices at 1185 Avenue of the Americas, New York, New York 10036, is an unincorporated association consisting of separately-owned professional hockey teams that operate out of many different cities and states within the United States and Canada.   The NHL is engaged in interstate commerce in the business of, among other things, promoting, operating, organizing, and regulating the major professional hockey league in the United States.

182.    As an unincorporated association of member teams, the NHL is a resident of each state in which its member teams reside, including the District of Minnesota where the NHL operates the Minnesota Wild.

## GENERAL ALLEGATIONS APPLICABLE TO ALL COUNTS

## I.    THE NHL'S KNOWLEDGE AND FAILURE TO WARN

183.    The robust body of medical and scientific studies and literature has, for many decades, firmly established that repetitive and violent jarring of the head or impact to the

head can cause MTBI with a heightened risk of long term, chronic neurocognitive sequelae.

184.    There is no way that Defendant, along with the expert medical personnel in its employ, did not know during Plaintiffs' and class members' careers that MTBI generally occurs when the head either accelerates rapidly and then is stopped, or is rotated rapidly.

### A.    Head Injuries, Concussions, and Neurological Damage

185.    The medical community generally recognizes four types of sports-related brain injuries: (a) concussion and sub-concussive events; (b) post-concussive syndrome; (c) second-impact syndrome; and (d) long-term brain damage.

186.    Concussion, the first type of injury, is a term used interchangeably with "MTBI."  This injury consists of trauma to the head and a resulting transient loss of normal brain function.  Loss of normal brain function can include dozens of symptoms, including dizziness, confusion, headache, blurred vision, memory loss, nausea, and unconsciousness.

187.    The American Association of Neurological Surgeons ("AANS") has defined a concussion as "a clinical syndrome characterized by an immediate and transient alteration in brain function, including an alteration of mental status and level of consciousness, resulting from mechanical force or trauma."  The AANS defines traumatic brain injury ("TBI") as:

> a blow or jolt to the head, or a penetrating head injury that disrupts the normal function of the brain.  TBI can result when the head suddenly and violently hits an object, or when an object pierces the skull and enters brain

tissue.   Symptoms of a TBI can be mild, moderate or severe, depending on the extent of damage to the brain.   Mild cases may result in a brief change of mental state or consciousness, while severe cases may result in extended periods of unconsciousness, coma or even death.

188.   Medical evidence has shown that symptoms of a concussion can reappear hours or days after the injury, indicating that the injured party has not healed from the initial blow.

189.   According to neurologists, once a person suffers a concussion, the person is up to four (4) times more likely to sustain a second one, and each successive concussion increases the seriousness of health risks and the likelihood of future concussions. Additionally, after suffering even a single concussion, a lesser blow may cause the injury, and the injured person requires more time to recover.

190.   Post-concussion syndrome, which may last days to years after someone suffers a concussion, generally involves depression, irritation, poor concentration, memory loss, mood swings, headaches, impaired speech and/or balance, dizziness, seizures, blurred vision, or general malaise.

191.   As with concussions/MTBI, only rest of both the brain and cognitive functioning can resolve these symptoms.

192.   Second-impact syndrome occurs when an athlete still healing from a prior concussion experiences a second, force-related event to the brain.   Second-impact syndrome can lead to coma, permanent brain-function loss, or death.

193.    Long-term effects of brain damage caused by repeated MTBI include Alzheimer's disease, dementia, and chronic traumatic encephalopathy ("CTE"), among other serious disorders.

194.    CTE, a catastrophic disease first associated with boxers long ago, results when a toxic protein, Tau, accumulates in the brain, kills brain cells, and leads to symptoms such as cognitive dysfunction, memory loss, sleeplessness, depression, diminished impulse control, episodes of anger, and dementia, among others.   Until recently, CTE could only be confirmed through an autopsy.   Tau proteins are released whenever concussion occurs.

195.    CTE is found in athletes (and others) with a history of repetitive concussions. Conclusive studies have shown this condition to be prevalent in retired professional hockey players who have a history of head injury.

196.    Clinical and neuropathological studies by some of the nation's foremost experts have demonstrated that multiple concussions sustained during an NHL player's career can cause severe cognitive problems.

197.    This head trauma triggers progressive degeneration of brain tissue. Degeneration of the brain can begin months, years, or even decades after the last concussion or the end of active athletic involvement, and has been diagnosed in many NHL hockey players.   The brain degeneration is associated with memory loss, confusion, impaired judgment, paranoia, impulse-control problems, aggression, depression, and eventually progressive dementia.

198.    In January 2010, the Boston University School of Medicine Center for the Study of Traumatic Encephalopathy ("BUSM") and the Veterans Affairs Boston

Healthcare System, in collaboration with the Sports Legacy Institute, neuropathologists confirmed for the first time that a former hockey player, New York Ranger Reggie Fleming, had been diagnosed with CTE.

199.    Subsequently, Rick Martin, best known for being part of the Buffalo Sabres' "French Connection," was posthumously diagnosed with CTE.   Martin was the first documented case of a hockey player not known to be a fighter or enforcer to have developed CTE.   Martin is believed to have developed the disease from severe blows to his head while not wearing a helmet.

200.    Within months of Martin's death, four former hockey enforcers suffered sudden and unexpected deaths:   Derek Boogaard, from a combination of painkillers and alcohol; Rick Rypien, of an apparent suicide; Wade Belak, of an apparent suicide and who, like Rypien, had reportedly suffered from depression; and Bob Probert, best known as one-half of the "Bruise Brothers" with then-Red Wing teammate Joey Kocur, of sudden cardiac arrest.   All four players had histories of fighting, blows to the head, and concussions, which led to more concerns about CTE and hockey.   BUSM doctors subsequently confirmed that Boogaard and Probert had CTE.

201.   For almost a century, while unnecessary violence, including brutal fist-fighting, has permeated NHL games, the NHL has been on notice that multiple blows to the head can lead to long-term brain injury, including but not limited to memory loss, dementia, depression, and CTE and its related symptoms.   There have been legions of studies throughout the eras proving these negative health consequences.   Yet, the NHL said nothing to its players about any of it.

### B.    85-year History of Medical Studies Related to Sports and Concussion

202.   In 1928, pathologist Harrison Martland published the first case of "Punch Drunk" syndrome in the *Journal of the American Medical Association* (the "Martland study").   The Martland study also described the clinical spectrum of abnormalities found in "almost 50 percent of fighters [boxers] . . . if they ke[pt] at the game long enough."

203.   The Martland study was the first to link sub-concussive blows and "mild concussions" to degenerative brain disease.

204.   In 1937, the American Football Coaches Association published a report warning that players who suffer a concussion should be removed from sports demanding personal contact.

205.   In 1948, the New York State Legislature created the Medical Advisory Board of the New York Athletic Commission for the specific purpose of creating mandatory rules for professional boxing designed to prevent or minimize the health risks to boxers.   After a three-year study, the Medical Advisory Board recommended, among other things:   (a) an accident survey committee to study ongoing accidents and deaths in boxing rings; (b) two physicians at ringside for every bout; (c) post-bout medical follow-up exams; (d) a 30-day period of no activity following a knockout and a medical follow up for the boxer, all of which was designed to avoid the development of "punch drunk syndrome," also known at the time as "traumatic encephalopathy;" (e) a physician's prerogative to recommend that a boxer surrender temporarily his boxing license if the physician notes that the boxer suffered significant injury or knockout; and (f) a medical investigation of boxers who suffer knockouts numerous times.

206.    The recommendations were codified as rules of the New York State Athletic Commission.

207.    In 1952, the *Journal of the American Medical Association* published a study of encephalopathic changes in professional boxers.   That same year, an article published in the *New England Journal of Medicine* discussed a three-strike rule for concussions in football—recommending that players cease to play football after receiving their third concussion.

208.    In 1962, Drs. Serel and Jaros looked at the heightened incidence of chronic encephalopathy in boxers and characterized the disease as a "Parkinsonian" pattern of progressive decline.

209.    A 1963 study by Drs. Mawdsley and Ferguson published in *Lancet* found that some boxers sustain chronic neurological damages as a result of repeated head injuries.   This damage manifested in the form of dementia and impairment of motor function.

210.    A 1967 study by Drs. Hughes and Hendrix examined brain activity impacts from football by utilizing EEG to read brain activity in game conditions, including after head trauma.

211.    In 1969, a report by the Royal College of Physicians of London confirmed the danger of chronic brain damage occurring in boxers as a result of their career.

212.    Additionally, in 1969 (and then again in the 1973 book entitled *Head and Neck Injuries in Football*), a paper published in the *Journal of Medicine and Science in Sports* by a leading medical expert in the treatment of head injuries recommended that any

41

concussive event with transitory loss of consciousness requires the removal of the football player from play and requires monitoring.

213.    In 1973, Drs. Corsellis, Bruton, and Freeman-Browne studied the physical neurological impact of boxing.   This study outlined the neuropathological characteristics of "Dementia Pugilistica," including loss of brain cells, cerebral atrophy, and neurofibrillary tangles.

214.    In 1973, neurosurgeon R.C. Schneider first described a disabling and sometimes deadly condition involving the second impact concussion occurring before symptoms of a first concussion resolve.   The study revealed that a re-injury to the already-concussed brain triggers swelling that the skull cannot accommodate.   This phenomenon was termed "second-impact syndrome" in 1984 by Dr. R.L. Sanders.

215.    In 1975, Drs. Gronwall and Wrightson looked at the cumulative effects of concussive injuries in non-athletes and found that those who suffered a second concussion took longer to recover than those who suffered from their first concussion.   The authors noted that these results applied to athletes, given the common occurrence of concussions in sports.

216.    In 1982, *Canadian Medical Association Journal* published an article titled "Return to athletic competition following concussion."   The article concluded:

> The basic recommendation is that return to training and competition should be deferred until all associated symptoms such as headaches have completely resolved.   The decision to return must take into account the nature of the sport, the athlete's level of participation, and the cumulative effect of previous concussions.   Some athletes will have to avoid any further participation in their sport.

217.    In 1986, the *Physician and Sportsmedicine* journal published an article by Dr. Robert Cantu, a widely-respected authority on brain injuries from the American College of Sports Medicine, titled "Guidelines for Return to Contact Sports after Cerebral Concussion."  Dr. Cantu established a system to grade the severity of concussions based on clear and obvious symptoms and corresponding guidelines for when players should return to play.  After publishing his article in 1986, Dr. Cantu added to the concussion grading scale in 2001, emphasizing the importance of post-traumatic amnesia in grading the severity of a concussion.   The Cantu guidelines for return to play are widely accepted and recognized in the medical community as being the most useful guidelines.  It is not plausible that the NHL and its medical personnel were unaware of these widely accepted guidelines.

218.    The foregoing references are by no means exhaustive.  Physicians and academics have exhaustively studied and reported the danger of concussions suffered both inside and outside of sports over the past eight decades.

219.    Between 1952 and 1994, numerous additional studies were published in medical journals including the *Journal of the American Medical Association*, *Neurology*, the *New England Journal of Medicine*, and *Lancet* warning of the dangers of single concussions, multiple concussions, and sports-related head trauma from multiple concussions.   These studies collectively established that:

a.    repetitive head trauma in contact sports has potentially dangerous long-term effects on brain function;

b.    encephalopathy (dementia pugilistica) is caused by repeated sub-concussive and concussive blows to the head;

43

c.      acceleration and rapid deceleration of the head that results in brief loss of consciousness in primates also results in a tearing of the axons (brain cells) within the brainstem;

d.      with respect to mild head injury in athletes who play contact sports, there is a relationship between neurologic pathology and length of the athlete's career;

e.      immediate retrograde memory issues occur following concussions;

f.      mild head injury requires recovery time without risk of subjection to further injury;

g.      head trauma is linked to dementia;

h.      a player who suffers a concussion requires significant rest before being subjected to further contact; and

i.      minor head trauma can lead to neuropathological and neurophysiological alterations, including neuronal damage, reduced cerebral blood flow, altered brainstem evoked potentials, and reduced speed of information processing.

220.    In 1998, a Canadian news article documented how frequent concussions are for NHL players:

> Concussions have become an epidemic in the NHL over the past several years, striking everyone from marquee players to fourth-line checkers.   The rash of concussions has led the NHL to try to improve prevention and diagnosis of concussions and has awakened many players and coaches.
>
> ***
>
> According to statistics provided by the NHL, 60 players had concussions last season during the regular season and the playoffs.   As of early February this season, 56 players already had received concussions.

221.    In 1999, the National Center for Catastrophic Sport Injury Research at the University of North Carolina conducted a study involving 18,000 collegiate and high school football players.   The research showed that once a player suffered one concussion, he was three times more likely to sustain a second in the same season.

222.    A 2000 study, which surveyed 1,090 former NFL players, found that more than 60% had suffered at least one concussion and 26% had suffered three or more during their careers.    Those who had sustained concussions reported more problems with memory, concentration, speech impediments, headaches, and other neurological problems than those who had not been concussed.

223.    In the last decade, numerous published, peer-reviewed scientific studies have demonstrated that playing professional sports is associated with significant risk for numerous negative long-term effects, including depression, cognitive disorders, and brain injuries such as dementia, Alzheimer's, and CTE.    Notably, there have been multiple studies published regarding the negative long-term effects of head impacts on current and former football players.

224.    For example, a 2007 study of NFL retirees found that of the retirees that had sustained one or two previous concussions, 11.5% reported that the injuries have had a permanent effect on their thinking and memory skills as they have aged.    Moreover, 11.1% of all respondents reported having a prior or current diagnosis of clinical depression.[1]

225.    A 2011 study of both active and former NFL players showed that 28% of the players studied suffered from depression, compared to only 9.5% of the general population.    *See* Daniel G. Amen, M.D.,et al., *Impact of Playing American Professional*

---

[1]    *See* Kevin M. Guskiewicz, et al., *Recurrent Concussion and Risk of Depression in Retired Professional Football Players*, MED. & SCI. IN SPORTS & EXERCISE, 903, 905 (2007).

*Football on Long-Term Brain Function*, 23:1 THE J. OF NEUROPSYCHIATRY AND CLINICAL NEUROSCIENCES, 98, 103 (Winter 2011).

226.    Professional athletes also experienced earlier onset of disease and dementia more frequently than the general American male population in the same age range.    Once there is a finding of impairment of mental functioning, the prognosis is poor; the vast majority of such patients develop Alzheimer's disease within a decade.    Notably, early detection of dementia and Alzheimer's can lead to a physician prescribing Vitamin E, the drug Namenda XR (memantine HCL), or a combination of the two, which recent studies demonstrate improves a person's ability to perform activities of daily living.

227.    For example, as discussed at the 2001 Vienna International Symposia on Concussions in Sport, since 1986, doctors worldwide have observed an "alarming" increase in the rate of MTBI found in ice hockey players—with the rate of MTBI increasing from 2% in the 1989-1990 season to 8% in the 1999-2001 season.

228.    An October 2005 study of retired professional football players investigating the association between previous head injury and the likelihood of developing mild cognitive impairment (MCI) and Alzheimer's found that retired players with three or more reported concussions had a fivefold prevalence of MCI and a threefold prevalence of significant memory problems, compared to other retirees.    *See* Kevin Guskiweicz, Ph.D, et al., *Association Between Recurrent Concussion and Late-Life Cognitive Impairment in Retired Professional Football Players*, 57 NEUROSURGERY 719, 719 (Oct. 2005).

229.    A 2009 study performed by the University of Michigan showed that 6.1% of retired NFL players over the age of 50 receive a dementia-related diagnosis compared to

the 1.2% national average for men of the same age.  *See* David R. Weir, et al., *National Football League Player Care Foundation Study of Retired NFL Players*, U. MICH., INSTITUTE FOR SOCIAL RES. Sep. 10, 2009, at 1, 32.

230.    A 2011 published, peer-reviewed scientific study showed that 36% of former NFL players, age 65-75, who were studied suffered from dementia, whereas the prevalence of dementia in the general population for the same age group is 2.2-6.5%.  *See* Daniel G. Amen, M.D., et al., *Impact of Playing American Professional Football on Long-Term Brain Function*, 23:1 THE J. OF NEUROPSYCHIATRY AND CLINICAL NEUROSCIENCES, 98, 103 (Winter 2011).

231.    A November 6, 2012, study analyzing neurodegenerative causes of death among a cohort of 3,439 former NFL players who played between 1959 and 1988 confirmed that the neurodegenerative mortality rate of professional football players is three times higher than that of the general United States population.  In fact, the rate of Alzheimer's and ALS in professional football players is four times higher.  *See* Everett J. Lehman, MS, et al., *Neurodegenerative causes of death among retired National Football League players*, 79 NEUROLOGY, 1, 2 (Nov. 6, 2012).

232.    In fact, a September 12, 2014, actuarial study submitted by the NFL in the lawsuit brought against it by thousands of retired NFL players estimated that nearly one-third of former NFL players will be diagnosed with either dementia or Alzheimer's. *See* Thomas Vasquez Ph.D., *NFL Concussion Liability Forecast* at 20, Analysis Research Planning Corp., Feb. 10, 2014, filed in *In re National Football League Players'*

*Concussion Injury Litig.*, No. 2:12-md-02323-AB  (E.D. Pa. Sept. 12, 2014), ECF No. 6167.

233.   Put simply, overwhelming evidence shows that CTE is caused by repeated sub-lethal brain trauma of the sort Plaintiffs repeatedly suffered.

234.   In January 2012, the Boston University Center for the Study of Traumatic Encephalopathy, which has performed autopsy examinations of the brains of deceased NFL players, estimated a lifetime prevalence rate of CTE of 3.7% for retired NFL players. The Center stated: "[a]lthough this represents a conservative estimate, it suggests a significant public health risk for persons who suffer repetitive mild traumatic brain injury." *See* Brandon E. Gavett, Ph. D. et al., *Chronic Traumatic Encephalopathy: A Potential Late Effect of Sport-Related Concussive and Sub concussive Head Trauma*, CLINICAL SPORTS MED., 1, 2 (Jan. 1, 2012).

235.   On September 16, 2014, the Icahn School of Medicine at Mount Sinai (NY) published the results of its neuroimaging case study regarding diagnosing CTE in living subjects.  Through an experimental radiolabeled compound called [18F]-T807, designed to latch onto the Tau protein in the brain, and using a positron emission tomography (PET) scanner, researchers were able to effectively diagnose CTE in a living subject.  *See* E.M. Mitsis, et al., *Tauopathy PET and Amyloid PET in the Diagnosis of Chronic Traumatic Encephalopathies: studies of a retired NFL player and of a man with FTD and a severe head injury*, TRANSLATIONAL PSYCHIATRY (Sept. 16, 2014).  Prior to this research, it was thought that CTE could only be diagnosed postmortem.

236.    Most recently, on September 30, 2014, it was reported that after studying brains of 79 deceased NFL players, one of the nation's largest brain banks confirmed that 76 of those players suffered from CTE.   According to the results, 78.9% of football players and 96.2% of former NFL players suffered from the disease.   *See* Josh Katzowitz, *PBS Frontline: 76 of 79 NFL Player Brains Studied Show Signs of CTE*, CBS SPORTS (Sept. 30, 2014).

237.    According to reports, NHL players are ***five times more likely*** to suffer a concussion than NFL players, which is devastating given that the NFL has admitted that nearly one in three NFL players will contract debilitating brain disease.   These numbers are also not surprising, since NFL players play on average four pre-season games and a 16-game season, and engage in only 11-15 minutes of actual playing time per game, while NHL players on average play six pre-season games and an 82-game season, and, except for fourth-liners and spare defensemen, play an average of 18-25 minutes per game.

238.    Some of the most accomplished experts on brain injuries have stated that sub-concussive impacts are more detrimental than concussive impacts.

239.    Sub-concussive impacts are repetitive sub-concussive blows to the head that are the building blocks of CTE.

240.    Sub-concussive impacts can be more dangerous because when sustained, they leave the brain as vulnerable to long-term damage as a diagnosed concussion; however, because they are not diagnosed as a concussion, the player continues to play and add damage to the affected portion of the brain.   Additionally, repeated sub-concussive blows lead to CTE.

241.    As one author observed: "Dr. Robert Cantu, the prominent neurosurgeon out of Boston and undisputed concussion expert, has stated that a lineman in the NFL, on one 80-yard drive, can sustain up to 18 sub-concussive blows.   18!   15,000 in a ten-year NFL career!"

242.    After reviewing the findings of Dr. Cantu and other scholars, one author noted: "It is the continuous small blows to the brain that are creating the damning evidence found in the brains of former football players."

243.    NHL players sustain thousands of these sub-concussive impacts every year. The NHL was or should have been aware of the neurological effects of sub-concussive impacts, yet did not warn its players or protect them.

244.    It is not plausible that the NHL was unaware of this body of literature.   In fact, NHL Commissioner Gary Bettman recently stated, "We have, on our own, a long history, going back to 1997, of taking concussions very seriously."   He added, "We spend a lot of time, money and effort working with the players' association on player safety." CNN, *NHL Facing 'Concussion' Lawsuit*, Int'l Ed., Nov. 26, 2013, http://www.cnn.com/2013/11/26/sport/nhl-lawsuit-concussion-10-players/index.html.

245.    To be sure, NHL Deputy Commissioner William Daly has disingenuously claimed that the NHL has taken a leadership role in teaching others about the dangers of concussions, notwithstanding its continued glorification of violence in its own league. For example, the NHL states that education has been a vital component of its mission since 1997, and that its "[e]ducational efforts are directed towards all relevant parties in our game, including most importantly our Players, but also relevant Club personnel, including

Club medical staff, Club owners and executives, team General Managers and Coaches, and on-ice game Officials."

246.    In connection with this education mission, Deputy Commissioner Daly said:

Our recent educational initiatives have focused on articulating and identifying many of the common visible signs and symptoms of a concussion so that Players will recognize when they, or a teammate, may be at risk. . . . ***It is our strong belief that the Players' health and safety will be enhanced if all relevant personnel clearly understand the latest science regarding concussions. . . .***

247.    The NHL also boasts that it has "assisted in the development of concussion educational programs for youth and junior age hockey players."   As a self-anointed leader in concussion education, the NHL has repeatedly portrayed itself as knowledgeable about current research in concussions and head trauma.

### C.    The Medical Community Has Focused on Hockey Players' Brain Injuries and the NHL Has Participated in or Attended Many of the Symposia Regarding Brain Injuries in Sports

248.    Since 2001, there have been four "International Symposia on Concussions in Sport."   These conferences took place in Vienna (2001), Prague (2004), and twice in Zurich (2009 and 2012).   Attendees included American doctors who are experts on the brain and concussions.

249.    The 2001 Vienna symposium included two reports focusing specifically on hockey.   "*Procedures After Minor Traumatic Brain Injury MTBI in Ice Hockey to Prevent Neurological Sequelae*" noted that since 1986, doctors worldwide had observed "an alarming increase in the rate of MTBI in ice hockey despite improved protective gear."   In the NHL, the proportion of MTBI had increased from 2% in the 1989-1990 season to 8% in

51

the 1999-2001 seasons.  This report recommended that "any confused player with or without amnesia should be taken off the ice and not be permitted to play again for at least 24 hours."

250.    The second Vienna symposium report, titled "*Concussion Experience: Swedish Elite Ice Hockey League*," focused on the seriousness of concussions in ice hockey.  The report noted an alarming increase in the number of concussions among players in the 1980s, which the authors of the report attributed to "[t]oday's ice hockey [being] faster and more physical."

251.    In 2004, neurological experts met in Prague to discuss recommendations for the improvement of safety and health of athletes who suffer concussive injuries in sports, including ice hockey, based on current research.  These experts recommended that a player should not be returned to play while symptomatic, and coined the phrase, "when in doubt, sit them out."   This echoed similar medical protocol established at a Vienna conference in 2001.

252.    A 2006 publication stated that "[a]ll standard U.S. guidelines, such as those first set by the American Academy of Neurology and the Colorado Medical Society, agree that athletes who lose consciousness should never return to play in the same game."

253.    Additionally, an abstract was presented at a 2012 conference titled "*Acute Clinical Signs and Outcome of Concussion in National Hockey League Players*," which concluded that concussions can produce a spectrum of acute on-ice clinical signs.

254.    Various conferences on the subject of sports-related concussions produced detailed protocols on examining a player believed to have suffered a concussion.

52

Members of the NHL Concussion Program attended many of these conferences, including all four of the International Symposia on Concussions in Sport.

255.    In North America, researchers have also focused on hockey and brain injuries.   A 2006 study, comparing the eight major contact sports (American football, boxing, ice hockey, judo, karate, tae kwon do, rugby, and soccer), found that ice hockey players have the highest rate of concussions.   At the professional level, ice hockey was second only to rugby for the highest rate of concussions.   *See Contact Sport Concussion Incidence*, 41 J. OF ATHLETIC TRAINING (Oct-Dec 2006).

256.    For the 2009-2010 season, Dr. Paul Echlin followed two junior hockey clubs to assess their incidence of concussions.   The report concluded that 25% of the players on the teams experienced at least one concussion in a 52-game season.   Twenty-nine percent of those players endured recurring concussions.   Dr. Echlin stated that concussions occurring in hockey may be seven times higher than reported in the then-current literature.

257.    Recently, Mayo Clinic sponsored two "Conferences on Concussions in Hockey," one in 2010 and the other in 2013.   Recommendations at the first conference led the NHL to begin taking concussions suffered by its players seriously.

258.    At the 2013 Conference, Dr. Michael Stuart, a director of the Mayo Clinic Sports Medicine Center and chief medical officer for USA Hockey, noted two recent fights in the NHL that resulted in players receiving concussive head injuries.   Recommendations made at that 2013 conference focused on eliminating fighting, such as those noted by Dr. Michael Stuart.

259.    As described above, the NHL has known for decades that MTBI can and does lead to long-term brain injury, including but not limited to memory loss, dementia, depression, CTE, and related symptoms.

260.    Rather than take immediate measures to protect its players from these known dangers, the NHL for decades failed to disclose to its players relevant and highly material health information it possessed regarding the significant risks associated with MTBI.   At the same time, the NHL promoted and encouraged violent blows to the head, including bare-knuckled fist-fighting, as a routine part of the game.

### D.    NHL's Knowledge of the Devastating Effects of Head Trauma Documented by Violent Incidents

261.    Although all NHL players face imminent risk of head trauma, the NHL's infamous incidents of violent head impacts and the negative repercussions of such impacts on its players demonstrate the NHL's actual knowledge of decades-old, League-wide problems.

262.    For example, in 1947, New York Rangers player William Ezinicki (known as "Wild Bill") of the Toronto Maple Leafs delivered a crushing check to Edgar Laprade of the New York Rangers that left Laprade sprawled unconscious on the ice with head trauma. Laprade was taken off the ice and his teammates thought he was dead.   Laprade wound up in the hospital with a concussion and needed five stitches to close a cut to his head.   In 1988, a Canadian media outlet ran a story regarding NHL player Edgar Laprade's hospitalization due to head trauma.   The bodycheck enraged Frank Boucher, the New York Rangers' head coach and general manager, who urged the NHL: "How much longer

is Ezinicki going to get away with elbowing, high sticking and deliberate injuries to opponents? Believe curb must be put on this player immediately." Then NHL president Clarence Campbell dismissed Boucher's concerns and appeal for further punishment and concluded that Ezinicki's contact with Laprade was legal.

263. Gordie Howe is one of the greatest NHL players in the history of the game, playing in the NHL from 1946 until 1980. Many of Howe's accolades may never be surpassed, even by fellow NHL Hall of Fame inductees. Early in his playing career, Howe sustained what would be the worst injury of his career, fracturing his skull after an attempt to check Toronto Maple Leafs' captain Ted Kennedy into the boards went awry during the 1950 playoffs. The fracture was so severe that Howe had to be immediately taken to a hospital for emergency surgery, drilling a hole into his head in order to relieve pressure on his brain. As a result of this head trauma, Howe developed a permanent facial tic and was nicknamed "Blinky" by his teammates. The next season, he returned to record 86 points, winning the scoring title by 20 points. Famed for his mixture of skill and toughness, his Hall of Fame biography even notes that "He threw his weight around and he never backed away from a fight." A news outlet recently reported that Howe is battling dementia, and his family "guarantees" that concussions are the cause.

264. In 1968, NHL player Bill Masterton of the Minnesota North Stars suffered a severe internal brain injury during Minnesota's game against the Oakland Seals. As Masterton carried the puck up the ice at full speed, opposing player Ron Harris collided into him. Masterton was knocked backwards, hitting his helmetless head on the ice and

falling into unconsciousness.   Masterton's brain was damaged so severely that he never

regained consciousness and died two days after the incident.

265.   In 1988, the Philadelphia Inquirer ran a story titled Hazardous Despite a

Player's Death, Helmets Were Long Ignored.   The article recounted Masterton's death in

1968 and criticized the NHL's cavalier attitude toward player safety:

> On Jan. 17, 1968, the NHL Players Association (NHLPA) issued a
> statement urging the league to adopt mandatory helmet legislation.
>
> Chicago's Stan Mikita, the league's MVP that year, and others began
> wearing helmets immediately after the death.   Blackhawks superstar
> Bobby Hull admitted that vanity alone had kept him from using a helmet
> and said that he would consider using one.
>
> The NHL, though, remained unmoved.
>
> Clarence Campbell, the imperious commissioner who refused to lend league
> sanction to a benefit game for Masterton's family, went so far as to suggest
> that the death was just one of those things.
>
> "It was a routine accident that could have happened in any hockey game…a
> normal hazard of the occupation," Campbell said in defense of NHL policy.
> "(Helmets) are optional now, and we think that is the best method of dealing
> with it."
>
> *      *      *
>
> Callous as it sounded, Campbell's attitude on helmets was merely reflective
> of a firmly held belief among league owners that their use was bad for the
> game.

266.   In 1977, opposing player Dave Farrish of the New York Rangers hooked

NHL player Rick Martin of the Buffalo Sabres around the neck from behind and kicked

Martin's feet out from under him, causing Martin to hit his head on the ice.   As a result of

Farrish's conduct, Martin hit his head on the ice, was knocked unconscious, and went into

convulsions.   A 1978 news article about the incident comments that Martin's head trauma could have been mitigated had Martin been wearing a helmet, but quotes then NHL president Zeigler with a countervailing remark, "'The league's position has been and is right now that the wearing of a helmet is up to the individual.'"

267.   In 1996, a Canadian media outlet ran an article titled *Comfort, safety clash in NHL helmet debate*, noting a "rash of concussions this season."   That same year, a Canadian media outlet ran an article titled *Concussions just a fact of hockey life*.

268.   In 1997, Dennis Vaske of the New York Islanders retired due to the effects of three concussions (although he did attempt a comeback in 1998-1999 with the Boston Bruins).   The first concussion he suffered was in the 1995-1996 NHL season, when he was hit from behind by Eric Lacroix of the Los Angeles Kings.   After that incident, Vaske recounted, "'[r]iding in that ambulance, I thought my head was going to explode.'"

269.   In 1998, the Canadian press ran an article regarding NHL player Nick Kypreos.   Kypreos played in the NHL from 1989 until 1997.   Kypreos was in a total of 81 fights in NHL games.   Kypreos was a Stanley Cup champion.   The 1998 article discusses how, on one occasion, Kypreos suffered a concussion during a game.   Instead of going to the hospital, Kypreos recounted that he attempted to participate in a subsequent practice. The article notes that there was "no protocol to follow" for NHL players who suffered concussions.

270.   In recounting a fight during a 1997-1998 pre-season game with Ryan VandenBussche which gave Kypreos a career-ending concussion, Kypreos is quoted as saying:

I lost my helmet and hit my head on the ice…. It's like a dream you can't remember.   Within one hour everything started to come back into focus.   I was being asked how I was feeling and if I could go back on the ice to finish the game.

271.    Pat LaFontaine played in the NHL from 1983 until 1998, suffering from six documented concussions.   In 1990, LaFontaine was knocked unconscious by a hit from an opposing player, James Patrick.   In 1996, LaFontaine was again knocked unconscious by a hard hit to the head, this time from opposing player Francois Leroux.   He attempted to recover and continue his career, but that attempt proved short-lived, as he collided with a teammate and sustained a career-ending concussion in 1998.   LaFontaine recounted his head trauma:

A neurologist at the Mayo Clinic asked me, "Did it feel like someone came along and ripped all the motivation and personality out of you?"   That was exactly what happened to me…I remember being scared because for the first month after my fifth concussion, I was very depressed at times.   I wouldn't want to come out of my room.   My wife was really scared because the littlest things would set me off.

272.    During this era, countless other NHL players were suffering life-threatening, career-ending concussions.   For example, Dean Chynoweth played in the NHL from 1988 until 1998.   Chynoweth reportedly suffered 13 concussions during his ten-year career, and was forced into retirement at the age of 28 due to concussion-related health concerns. Chynoweth was in a total of 38 fights in his NHL career.

273.    Gino Odjick played in the NHL from 1990 until 2002.   Odjick, a prominent enforcer, was known as the "Algonquin Assassin" and was in a total of 154 fights in NHL games.   In the last two years of his career, Odjick sometimes became so forgetful that he could not find the hockey rink, even though "[i]t was just one turn to the right, one turn to

58

the left to get to the rink, but I got lost just going there."   Odjick's career came to a sudden end when he was hit in the back of the head by a puck.   Odjick subsequently suffered from persistent dizziness and headaches and retired from the NHL.   Odjick has since struggled with depression and other mental health issues, and has stated that he has spent 32 months in hospitals since his retirement due to his concussions.

274.   Steve Moore and Mark Moore were brothers who were drafted into the NHL. Mark Moore never played an NHL game due to a minor league concussion he suffered. Steve Moore had played 69 games in the NHL before his career was suddenly cut short in 2004 by opposing player Todd Bertuzzi, who struck Moore from behind and, in the attack, landed on top of him, resulting in a fractured neck and concussion.

275.   In response to the attack, the NHL suspended Bertuzzi for the remainder of the season, a mere 20 games.   Bertuzzi is currently an unrestricted free agent of the NHL and has played in over 1,000 games.   Steve Moore's recurring concussion symptoms kept him from ever returning to the NHL.

276.   Keith Primeau played in the NHL from 1990 until 2006.   Primeau suffered four documented concussions in the NHL, where he was in a total of 81 fights.   In the 2003-2004 season, Primeau missed 21 NHL games due to concussions.   In 2006, Primeau suffered a career-ending concussion at the hands of Alex Perezhogin, who hit Primeau in the head.   Because of lingering concussion symptoms, Primeau retired from the NHL and has agreed to have his brain donated for use in Boston University's research effort into the causes of CTE in athletes.

277.    In 2004, before this incident with Primeau, Perezhogin swung his stick at the face of an opposing player in a minor league hockey game.    The opposing player was knocked unconscious and started convulsing on the ice.    The player required twenty stitches in his face, lost teeth, and suffered a concussion.    Perezhogin was criminally prosecuted by the local authorities and was sentenced to one year of probation, though he was still called up to the NHL a year later.

278.    In 2010, NHL player Marc Savard was carried off the ice after a collision with opposing player Matt Cooke.

279.    Savard suffered a Grade 2 concussion from the hit; on-ice officials did not penalize Cooke for the hit.    In response to Cooke's collision with Savard and in explaining why Cooke was not suspended, NHL Commissioner Gary Bettman stated:    "'I was very unhappy and upset with that hit'…. 'I was more upset there was nothing [in the NHL's rules] to do to punish it.'"    Cooke's hit on Savard was characterized as "'[a]very surgical hit to the head.'"    After suffering head trauma from his interaction with Cooke, Savard was later hit by other opposing players.    Savard has described the daily struggles with the lasting effects of head injuries: "'I'm still hoping that something happens that I'll feel a lot better.    But if I feel like this, I still couldn't play.'"

280.    Paul Kariya played in the NHL from 1994 until 2010, was an NHL all-star, and achieved numerous accolades during his tenure, including the Lady Byng Trophy for the NHL's most gentlemanly player.    Kariya likewise had an illustrious amateur career, receiving the award for the top collegiate hockey player in 1993 and winning Olympic medals, including the gold medal in 2002 at the Salt Lake City Winter Olympics.

281.    Kariya ended his NHL career due to the negative effects of head trauma he received.  In 1996, an opposing player hit Kariya during an NHL game, concussing Kariya.  The player was not penalized during the game, but was subsequently suspended by the NHL.  Kariya missed two games because of the concussion.  In 2003, Kariya collided with an opposing player during an NHL game, where he laid on the ice motionless and had to be helped to the locker room.  Kariya later returned to play in that same game. In one infamous instance, Kariya suffered a blindside hit to the face while celebrating a goal from opposing player Gary Suter, leaving Kariya unable to play for the rest of the season and the 1998 Olympics.

282.    The NHL suspended Suter for a total of four games.  Suter had also been accused of intentionally trying to injure Wayne Gretzky during a Canada Cup game where he slammed Gretzky into the boards, eliminating him from the Championship Round. The NHL inducted Suter into its "Hall of Fame" in 2011.

283.    Kariya has suffered from headaches and short-term memory loss as a result of his repeated head trauma.  Since retirement, Kariya has been an outspoken critic of the NHL, stating in interviews:

> The thing that I worry about is that you'll get a guy who is playing with a concussion, and he gets hit, and he dies at centre ice…. There's too much of a lack of respect players have for one another…. If the league wants to stop that kind of conduct, it will have to punish players…. Ten-game suspensions…and more, have to be brought back to help wake up players. There probably isn't a player in the league who hasn't had a concussion.

284.    Eric and Brett Lindros were brothers who played in the NHL.  Eric Lindros was the NHL MVP in 1995 and a 2002 Olympic gold medal winner.  Eric Lindros also

suffered eight concussions from 1998 through 2005, which eventually led to his retirement in 2007. Eric Lindros's former team, the Philadelphia Flyers, downplayed the seriousness of his concussion condition and questioned whether he took too long to rehabilitate from the concussions.

285. Brett Lindros retired two years after playing in the NHL at the age of 20. Brett Lindros had sustained numerous concussions by the age of 20 and is quoted as stating:

> What was scary for me was each time it took longer to resolve—my last concussion before my 20th birthday took eight or nine weeks…. Sometimes I had memory loss on the bench.

286. A Canadian news source noted Brett Lindros's outspoken views on the issue of concussions. Brett Lindros stated: "It's every kid's dream to play in the NHL… My dreams have basically been shattered." The article went on to note:

> Although Lindros's concussions at the pro level are well documented, he said he wasn't sure how many he might have suffered during his junior career with the Kingston Frontenacs of the Ontario Hockey League.

287. The news source also interviewed coaches and management from Brett Lindros's team, the New York Islanders, which noted the frequency of concussions and the NHL's willful disregard of the problem. For instance, Mike Milbury, the team's then general manager and coach, stated: "And I think not only do we have to think how to treat a concussion, you have to think more in terms of preventive measures. It used to be in old-time hockey you'd take a hit, you'd get your bell rung and you'd go right back out there. Obviously, we've got to rethink that."

288.    Mr. Milbury's recent statements, on national television, that fighting in the NHL needs to be eliminated because the concussion risks are simply too high demonstrates recognition of a long-undeniable reality.

289.    After retirement, Eric Lindros was also vocal about his views on the concussion problems.  In fact, Eric Lindros started a call to action in the ice hockey community through his association with the Ontario Brain Injury Association.  A Canadian news source quoted Eric Lindros as stating as follows:

> It's time to understand that we have a problem… We just don't want anyone to go through this again…. You cannot fix a brain, that's something I had to learn.  It's not like a shoulder or a knee… Hockey is an old sport.  It's the old-school boys and an old way of thinking.  We have to change that thinking a little bit.  I bought into it, I wanted to be a tough guy.  But it didn't do me any good.  That's what came home to me obviously…my brother can't play hockey anymore…. Hopefully, other kids won't have to go through this frustration and a shortened dream of playing in the league…. The lack of response from the hockey community has frustrated me.

290.    Another Canadian news article discussed the outreach on the NHL's concussion problem by the Lindros family, noting how different the NHL's stance on concussions is from other elite ice hockey organizations in the world: "In European hockey, historically, if a player has a concussion, he's automatically out three weeks. That seems bizarre to North Americans."  The Lindros family criticized the NHL's stance on concussions, which involved "baseline testing:"

> But you can return to baseline and still be concussed…. Not all teams rest players for the same period of time as it's taken them to lose the symptoms of concussion.  Some teams are knowledgeable, others ignore them [symptoms] as if they just didn't happen.

291.    From the infamous hits, like the one to Edgar Laprade that left him sprawling, unconscious, on the ice in 1947, and Todd Bertuzzi's vicious hit on Steve Moore in 2004 that ended a career, to all the concussive and sub-concussive blows in between and beyond, the NHL's failure to inform players of the actual increased risks to long-term brain health remained constant.

292.    At the end of 2012, in the NHL Board of Governors meeting, Commissioner Gary Bettman addressed the successive deaths, decades of concussion evidence, and dangers of fighting in the NHL, callously stating "I think it's unfortunate if people *use tragedies to jump to conclusions that probably at this stage aren't supported* …. I think people need to take a deep breath and *not overreact*."   He further implied that economics were a key factor in the NHL's decision-making, confessing that, "fans tell us that they like the level of physicality in our game, and for some people it's an issue, but it's not as big an issue in terms of fans and the people in the game to the extent that other people suggest it is."

### E.    Contact in Training Camp and Practices Caused Repeated Exposure to Concussive and Sub-Concussive Impacts.

293.    The risk of head injuries is not limited to NHL games; head injuries occur during the practices in which NHL players must participate.

294.    NHL players go through a rigorous training camp every year which determines which players will make the regular season roster.   These training camps are many times the most intense experiences—physically and mentally—that an NHL player will ever experience because this period will determine whether that player will have a job

64

in the NHL.    Consequently, players are put through practices which involve contact—including to the head—and are meant to "separate the boys from the men."

295.    Once the intense yearly training camp is finished, players then occasionally experience some contact in practices during the days in between the games.    During these practices, players sometimes simulate game-like conditions, subjecting them to concussive and sub-concussive effects.

296.    Blows to the head during practices and drills have a latent effect on the brain. Repetitive exposure to accelerations to the head causes deformation, twisting, shearing, and stretching of neuronal cells such that multiple forms of damage take place, including the release of small amounts of chemicals within the brain, such as the Tau protein. Among other things, the gradual build-up of Tau—sometimes over decades—causes CTE, which is the same phenomenon as boxer's encephalopathy (or "punch drunk syndrome") studied and reported by Harrison Martland in 1928.

## II.    THE NHL HAS PROMOTED UNNECESSARY BRUTALITY AND VIOLENCE TO BECOME A DOMINANT ELEMENT OF THE GAME AS PLAYED IN THE LEAGUE

### A.    NHL Hockey Has Created and Fostered an Unnecessarily Violent Sport.

297.    From the time of its formation in 1917, the NHL quickly found its roots in brutality and violence among its players.    For example, in 1923, notoriously violent Montreal Canadiens player Sprague Cleghorn used his hockey stick to strike Ottawa Senators player Lionel Hitchman over the head.    Cleghorn was criminally charged and found guilty of assault for his misconduct during the game.

298.    In 1927, Boston Bruins player Billy Coutu instigated a bench-clearing brawl during the Stanley Cup finals.   Coutu punched referee Jerry LaFlamme, and attacked referee Billy Bell.   The NHL banned Coutu for life after the incident and fined him $100, or over $1,300 in 2014's dollar value.   The NHL lifted the ban five years later.

299.    On November 23, 1929, after an on-ice fight between Boston Bruins' Eddie Shore and Montreal Maroons' Dave Trottier, it was reported that the Maroons spent the rest of the night trying to get even with Shore.   The game had to be stopped in the third period in order to clean up all the blood from the ice.   Shore ended up in the hospital with a broken nose, four lost teeth, two black eyes, a gashed cheekbone, cuts over both eyes, and a concussion.

300.    In 1955, Boston Bruins player Hal Laycoe hit Montreal Canadiens player Maurice Richard over the head with his hockey stick, resulting in his bleeding profusely on the ice.   In retaliation, Richard struck Laycoe on the shoulder with his stick, punched another Bruins player in the face, and punched a referee.   The Boston police attempted to arrest Richard in the locker room, but were supposedly kept away by Richard's teammates.

301.    As the NHL continued to thrive in subsequent eras, so did routine and brutal violence.   This continued growth can be best exemplified through the "enforcers" or "goons" of the 1970s, 1980s, and 1990s—players known for using intimidating force to protect marquee teammates and respond aggressively to physical or foul play. Oftentimes, these players were put and kept on NHL teams precisely for their physicality, not their pure hockey skills.   And even skill players, who had never had a single fight in

their high school, college, or minor league hockey careers, were forced to become "goons" or "enforcers" in order to keep their jobs.

302.   One of the best examples of NHL "goons" was the Philadelphia Flyers' "Broad Street Bullies."   Although the Flyers franchise did not exist until 1967, in just a few years NHL teams would see their home attendance double when they were playing the Flyers.

303.   As the violence in the NHL continued, it appeared that outside observers became concerned about the vicious acts promoted and glorified by the NHL.   For example, in 1974, the Ontario Cabinet appointed Canadian lawyer William McMurtry to issue a report on violence in minor hockey.   As part of his research, McMurtry interviewed numerous NHL players.   His official report was stark and concluded:

> In talking to numerous players in the NHL and WHA, they all feel that most advertising and selling of the game is over-emphasizing the fighting and brawling at the expense of educating the crowds about the skill and finesse. This past season the advertising for the NBC Game of the Week showed a film clip of a hockey fight.   Can you conceive of any other sport promoting itself in this fashion?

304.   In 1975, Bobby Hull, considered among the greatest NHL players of all time, staged a one-game strike in protest of the NHL's commoditization of violence, stating "[t]he game is no pleasure any more. It's an ordeal."   Hull further stated:

> It's time we took some action…because, if something isn't done soon, it will ruin the game for all of us.   I've never seen so much stuff like this.   I never thought it could be so bad…. It's becoming a disaster…. The idiot owners, the incompetent coaches, the inept players are dragging the game into the mud.   They're destroying it with their senseless violence….

305.    On February 17, 1986, *Sports Illustrated* published an article entitled, *Hockey? Call It Sockey: Hockey's designated hit men are making a travesty of the game. It's high time to get rid of all the goons*, where it firmly criticized the NHL's failure to take action against violence, stating:

> [M]any NHL executives are scared to death that if fighting were banned from hockey, thousands of season-ticket holders who get their jollies from watching grown men in short pants in a quasi-legal, bare-knuckle battle would bail out on the spot.   Violence sells.   That's not news, so does sex. If that's what's important, why doesn't the league hire a bunch of bikini clad bimbos to skate around behind the Zambonis holding up placards showing each team's penalty totals?

306.    Moreover, law enforcement authorities began to criminally charge NHL players for their on-ice conduct, even while the NHL remained silent.

307.    In 1988, Minnesota North Stars player Dino Ciccarelli was criminally prosecuted when, during a game against the Toronto Maple Leafs, Ciccarelli attacked Maple Leafs player Luke Richardson with his stick.   Ciccarelli was subsequently sentenced to one day in jail and fined $1,000.

308.    In 2000, Canadian authorities charged and convicted NHL player Marty McSorley of assault with a weapon, after he attacked opposing Vancouver Canucks forward Donald Brashear with his stick, with three seconds left in the game.   Brashear fell on his head, lost consciousness, and suffered a concussion.   McSorley was sentenced to 18 months' probation.   The NHL only suspended McSorley for a year.

309.    Vancouver Canucks player Todd Bertuzzi pleaded guilty to assault charges following the March 8, 2004, incident, described above, in which he threw a right hook to the back of Colorado Avalanche player Steve Moore, after Moore supposedly refused to

turn and face him. In September of 2014, after ten years of litigation during which Bertuzzi claimed that the Canucks coach told players during the second intermission of the game that Moore needed to "pay the price" for his hit against another Canucks player five days earlier, it was announced that Bertuzzi and Moore had reached a private settlement regarding the matter.

310.    In 2011, Mario Lemieux, then owner of the Pittsburgh Penguins and one of the most respected hockey players of all time, spoke out against the growing violence in the NHL. Specifically, in response to the NHL's failure to discipline players following a fight-filled game between the Pittsburgh Penguins and New York Islanders, Lemieux posted the following in a letter on the Pittsburgh Penguins' website:

> Hockey is a tough, physical game, and it always should be. But what happened Friday night on Long Island wasn't hockey. It was a travesty. It was painful to watch the game I love turn into a sideshow like that. The NHL had a chance to send a clear and strong message that those kinds of actions are unacceptable and embarrassing to the sport. It failed. We, as a league, must do a better job of protecting the integrity of the game and the safety of our players. We must make it clear that those kinds of actions will not be tolerated and will be met with meaningful disciplinary action. If the events relating to Friday night reflect the state of the league, I need to re-think whether I want to be a part of it."

311.    On February 21, 2011, in an article entitled *Fighting Hockey Violence A Losing Battle*, discussing Lemieux's remarks, the *National Post* stated:

> Violence in hockey persists for one simple reason: Today, as in 1975, the men who control the game have no interest in eliminating it. Forget all the familiar rationalizations and explanations. Any reasonable analysis would conclude that players should not be policed by other players, that the threat of retaliation should not be used to enforce good behavior, that infractions of the rules should not be used to market a sport.

312.    According to hockeyfights.com:

(a)    In the 2013-2014 NHL regular season, there were a total of 469 fights, involving 288 players.  Out of 1,230 games, 366 had fights.  Of those games with fights, 78 had more than one fight.  For the pre-season, there were a total of 100 fights, involving 149 players. Out of 104 games, 59 had fights.   Of those games with fights, 20 had more than one fight.

(b)    In the 2012-2013 NHL regular season, there were a total of 347 fights, involving 245 players.   Out of 720 games, 264 had fights.   Of those games with fights, 66 had more than one fight.

(c)    In the 2011-2012 NHL regular season, there were a total of 546 fights, involving 321 players.  Out of 1,230 games, 423 had fights.  Of those games with fights, 98 had more than one fight.  For the pre-season, there were a total of 72 fights, involving 115 players. Out of 108 games, 49 had fights.   Of those games with fights, 16 had more than one fight.

(d)    In the 2010-2011 NHL regular season, there were a total of 645 fights, involving 348 players.  Out of 1,230 games, 458 had fights.  Of those games with fights, 117 had more than one fight.  For the pre-season, there were a total of 115 fights, involving 183 players. Out of 106 games, 67 had fights.   Of those games with fights, 33 had more than one fight.

(e)    In the 2009-2010 NHL regular season, there were a total of 714 fights, involving 341 players.  Out of 1,230 games, 493 had fights.  Of those games with fights, 171 had more than one fight.  For the pre-season, there were a total of 164 fights, involving 209 players. Out of 109 games, 74 had fights.   Of those games with fights, 50 had more than one fight.

(f)    In the 2008-2009 NHL regular season, there were a total of 734 fights, involving 355 players.  Out of 1,230 games, 509 had fights.  Of those games with fights, 173 had more than one fight.  For the pre-season, there were a total of 151 fights, involving 183 players. Out of 111 games, 70 had fights.   Of those games with fights, 44 had more than one fight.

(g)    In the 2007-2008 NHL regular season, there were a total of 664 fights, involving 324 players.  Out of 1,230 games, 473 had fights.  Of

those games with fights, 143 had more than one fight.   For the pre-season, there were a total of 121 fights, involving 164 players. Out of 105 games, 63 had fights.   Of those games with fights, 30 had more than one fight.

(h)     In the 2006-2007 NHL regular season, there were a total of 497 fights, involving 292 players.   Out of 1,230 games, 384 had fights.   Of those games with fights, 87 had more than one fight.   For the pre-season, there were a total of 92 fights, involving 138 players. Out of 105 games, 55 had fights.   Of those games with fights, 27 had more than one fight.

(i)     In the 2005-2006 NHL regular season, there were a total of 466 fights, involving 276 players.   Out of 1,230 games, 357 had fights.   Of those games with fights, 80 had more than one fight.   For the pre-season, there were a total of 108 fights, involving 138 players. Out of 111 games, 67 had fights.   Of those games with fights, 29 had more than one fight.

(j)     In the 2003-2004 NHL regular season, there were a total of 789 fights, involving 340 players.   Out of 1,230 games, 506 had fights.   Of those games with fights, 172 had more than one fight.   For the pre-season, there were a total of 137 fights, involving 168 players. Out of 137 games, 79 had fights.   Of those games with fights, 35 had more than one fight.

(k)     In the 2002-2003 NHL regular season, there were a total of 668 fights, involving 321 players.   Out of 1,230 games, 464 had fights.   Of those games with fights, 139 had more than one fight.   For the pre-season, there were a total of 143 fights, involving 165 players. Out of 120 games, 78 had fights.   Of those games with fights, 43 had more than one fight.

(l)     In the 2001-2002 NHL regular season, there were a total of 803 fights, involving 348 players.   Out of 1,230 games, 519 had fights.   Of those games with fights, 172 had more than one fight.   For the pre-season, there were a total of 122 fights, involving 168 players. Out of 109 games, 67 had fights.   Of those games with fights, 35 had more than one fight.

(m)     In the 2000-2001 NHL regular season, there were a total of 684 fights, involving 329 players.   Out of 1,230 games, 469 had fights.   Of those games with fights, 155 had more than one fight.   For the

pre-season, there were a total of 126 fights, involving 167 players. Out of 122 games, 72 had fights.   Of those games with fights, 31 had more than one fight.

**B.     Other Sports Are Violent Too, But Extreme Violence Is Unique to NHL Hockey**

313.    As demonstrated above, the NHL has for decades fostered an unreasonably and unnecessary violent League full of sheer brutality by, among other things, promoting fighting and even distinguishing between fighting during play and not during play.   While the NHL continues to generate billions in revenue with its violent culture, the violent dynamic of the NHL is wholly unique to the NHL.   Other elite and professional ice hockey leagues successfully promote a completely different style of play, including Olympic and European ice hockey, in which finesse, speed, skill, and power without violence dominate, and fighting is nearly nonexistent.

314.    Other professional hockey and sports leagues have harsh punishments against fighting, resulting in the near extinction of fighting from the game.   For example, fighting is prohibited by the International Ice Hockey Federation ("IIHF"), which governs Olympic hockey and most international leagues.   IIHF Rule 141, Fighting, penalizes any player "who punches an opponent during game action, after a whistle, or any time during the regular course of a game during a prolonged player confrontation."   Instigators of fights are penalized with immediate ejection from the game, and IIHF authorities are given discretion to issue further suspensions.

315.    Amateur hockey leagues similarly punish fighting much more harshly than the NHL does.   The National Collegiate Athletic Association ("NCAA") prohibits

"fighting or punching" in U.S. college hockey.   Pursuant to Rule 48 of the NCAA Hockey

Rules and Interpretations, any player caught fighting is immediately disqualified, removed

from the game, and suspended from playing in the next game.   The act of instigating

results in removal from the game and a two-minute penalty for the team, while continuing

a fight results in removal from the game for ten minutes, suspension, or disqualification.

316.   Likewise, Canadian Interuniversity Sports ("CIS"), governing universities in

Canada, penalizes fighting in ice hockey with a game misconduct, resulting in the

offending player's ejection from the game and a suspension for the subsequent game.   The

second fight means a game misconduct and two-game suspension; and a third fight means

a game misconduct, a minimum three-game suspension, and a review by the league.   The

rules are virtually identical through Canada's Ontario, Atlantic, and Canada West

conferences.

317.   According to University of Saskatchewan head ice hockey coach, Dave

Adolph:

> Everybody thought it would hurt our game.   It has not…. Our league is a
> better place without fighting…. The day they took fighting out, all us young
> coaches were totally petrified that—without the guy who could keep
> someone honest—it would all escalate.   It has not…. There's a little more
> stick work, and a few more pretenders, but we don't have the concussion
> problems.   No one tries to hurt the skill guys.   You almost stand out if
> you're an idiot at our level.

318.   There are still more professional sports leagues that also prohibit fighting.

The National Basketball Association ("NBA") imposes severe penalties upon players who

fist-fight.   Any player who fights, punches, ***attempts*** to punch, or elbows the head of

another player is "ejected immediately" and is subject to a fine and/or suspension by the

Commissioner.   The fine ranges from a minimum of $1,000 to a maximum of $35,000 for the first offense.

319.    The NBA further states in its rulebook's "Comments on the Rules" section:

Violent acts of any nature on the court will not be tolerated.   Players involved in altercations will be ejected, fined, and/or suspended.

There is absolutely no justification for fighting in an NBA game.   The fact that you may feel provoked by another player is not an acceptable excuse.   If a player takes it upon himself to retaliate, he can expect to be subject to appropriate penalties.

320.    The NFL prohibits all players from striking any other player with fists.   Any player who punches another player is immediately ejected from the game and his team is assessed a 15-yard penalty.

321.    Indeed, as opposed to the NHL, where in 2013 there were a remarkable 444 fights involving 282 players in nearly one-third of all NHL games, only a handful of NFL players were involved in fighting that same year.

322.    By both enforcing their rules and imposing proportional punishments, other sports have successfully curbed violent fights from breaking out in their games, and essentially eliminated all fighting in the sport.

323.    By promoting and, in fact, glorifying fighting, the NHL continues to perpetuate its message to players, coaches, and fans that blows to the head should not be considered serious injuries.

### III. RATHER THAN USE ITS RESOURCES TO PROTECT PLAYERS FROM DANGERS, ABOUT WHICH THE NHL KNEW OR SHOULD HAVE KNOWN, IT CAPITALIZED ON VIOLENCE WHILE DOWNPLAYING RISKS

#### A. NHL Can Financially Fulfill Its Safety Duties to Its Players

324.   Enormously successful, thanks to the skill, speed, courage, and dedication of the Plaintiffs, the NHL is financially capable of providing full and accurate information about the risks of head trauma to the players.   It has chosen not to, however.

325.   The NHL generates approximately $3,300,000,000.00 in gross income per year and oversees America's most popular hockey league, acting as a trade association for the benefit of the 30 independently-operated teams.   The NHL's average attendance per game in 2012-1013 was 17,760, 97% of capacity.   It has been reported that the League's revenue will increase to $4,000,000,000.00 for the 2014-2015 season.

#### B. The NHL Admits It Profits from Extreme Violence

326.   For nearly a century, the NHL has developed and promoted a culture of gratuitous violence within NHL hockey.

327.   Part of the NHL's strategy has been to promote brutality and violence by glorifying the violent aspects of the game, including but not limited to the brutal and ferocious head-snapping checks and the vicious bare-knuckle fist-fights that occur on the ice.

328.   The NHL's approach to player safety can correctly be called, at best, cavalier, and, at worst, non-existent, as the NHL supports and promotes a highly calculated, profit-driven philosophy, spearheaded by the promotion of the NHL's

hyper-aggressive, unnecessarily violent style of play that leads directly to players suffering traumatic brain injuries.

329.    The NHL has expressly and regularly acknowledged that it has capitalized on extreme violence, including fighting.

330.    In the 1974 McMurtry Report, discussed above, then NHL President Clarence Campbell expressly acknowledged that the NHL's business is to increase support at the box office through whatever means necessary:

> [I]t is the business of conducting the sport in a manner that will induce or be conducive to the support of it at the box office…. Show business, we are in the entertainment business and that can never be ignored.   We must put on a spectacle that will attract people.

331.    According to the McMurtry Report, McMurtry and Campbell had the following conversation regarding the type of pressure facing players to fight:

> **McMurtry**: And right now it is extremely difficult for the player who is being provoked and being pushed to turn his back and appear to be running….
>
> *        *        *
>
> **McMurtry**: To have the sanction there of being embarrassed and ridiculed and to be discussed among your peers and your coach and many millions of fans, that is not one of the most difficult decisions in the world for a person, to turn his back and not fight?
>
> **Campbell**: I didn't say it wasn't difficult. I said it is an alternative.
>
> **McMurtry**: Then if you will agree it is a very difficult alternative, it is apparently what you call the free alternative.
>
> **Campbell**: All right.
>
> **McMurtry**: There is incredible pressure and duress on that player not to turn his back—is that not true?

**Campbell**: I don't think it is as great as you say, but it is real.

**McMurtry**: There is a real pressure and duress on that player to stand his ground and to fight?

**Campbell**: I think so, yes, yes.

332.   In 1988, *The Miami Herald* quoted then NHL President John Ziegler ("Ziegler") as stating, "Violence will always be with us in hockey…. Anytime you get a situation of high anxiety and frustration in any walk of life, you get violence."

333.   In a 1989 interview with *The Wall Street Journal*, Ziegler went on to explain why he would not put an end to fighting in the NHL:

> If you did that, you wouldn't be commissioner for long…. The view of the 21 people who own the teams, and employ me, is that fighting is an acceptable outlet for the emotions that build up during play.   Until they agree otherwise, it's here to stay…. ***The main question about fighting is, "Does the customer accept it?"   The answer, at present, seems to be yes.***

334.   In a 2007 press conference, current NHL Commissioner Gary Bettman explained that "[W]e're ***not looking to have a debate*** on whether fighting is good or bad or should be part of the game." and continued ***"[f]ighting has always had a role in the game…..*** "

335.   In 2011, Commissioner Bettman highlighted fan support as a reason why fighting and other extreme violence persists in NHL hockey: "Our fans tell us that they like the level of physicality in our game, and for some people it's an issue ***but it's not as big an issue in terms of fans and people in the game*** to the extent that other people suggest it is."

336.   In 2013, Commissioner Bettman called fighting in NHL hockey a "thermostat" that helps cool things down when tensions run high.

337.    In August 2013, 66% of the delegates at the Canadian Medical Association's annual meeting voted to "condemn the complacency" of the NHL in regards to violence in hockey.   CMA president and injury-prevention expert Louis Francescutti commented: "What we want to do is make it crystal clear that violence must be addressed…purposely hurting someone is not part of the game of hockey."

338.    The NHL regularly continues to feature violent hits and fights in commercials for the game, and other advertising, and features such violence prominently on its website.   For example, in 2012, the NHL gave "feature billing on the league's website" to a video of an infamous brawl in Madison Square Garden involving six experienced fighters fighting at once.   According to an article from the *Canadian Press*, the NHL gave "no fines or suspensions" to those involved.

339.    For instance, the NHL promotes the HBO Documentary, *Broad Street Bullies*, on its Philadelphia Flyers affiliated website.   The trailer for the film, viewable on www.flyers.nhl.com, features clip after clip of fighting and violent head shots, accompanied by voice-over testimonials extolling the virtues of winning through "intimidation" over talent.

340.    The NHL's philosophy regarding brutality and violence is also exemplified by NHL Original Products—an agent and instrumentality of the NHL devoted to producing promotional films for the NHL.   NHL Original Products has created numerous features that focus on the hardest hits that take place on the ice, further advancing the NHL's culture of violence as entertainment.

341.    A simple search of either "hits" or "fights" on www.nhlfilmsarchive.com reveals numerous highlights and compilations of the violent hits and fights that have taken place in the NHL over the years.    Whether affiliated with the NHL or not, nhlfilmsarchive.com exists, and the NHL allows its intellectual property to be used and its violent footage to be featured.

342.    In addition, if a person were to visit www.nhl.com during the regular season, they would see enforcers and fisticuffs in the main news story rotation on a nightly basis.

343.    The NHL Network produces a weekly program segment called "Top 10 Hits of the Week."    Those clips are archived for viewing on the nhl.com website.

344.    Individual teams also show in-game replays of violent hits, with the marquee "Hit of the Game" above the jumbo television screens.

345.    NHL Films, an agent and instrumentality of the NHL devoted to producing promotional films, has created numerous highlight features that focus solely on the hardest hits that take place on the ice.    These featured videos are marketed and sold to advance the NHL's culture of violence as entertainment.

346.    In addition, NHL-sponsored video games include fighting and vicious body checking.    Video game players can even add virtual enforcers to their team rosters.    For example, the NHL licensed EA Sports to produce *NHL 14*, released on September 10, 2013, and which featured a completely revamped fighting system called the "Enforcer Engine."    Those new features included: (a) enforcers coming to the aid of downed superstars and initiating fights; (b) "physics-based punch targeting" that make blows more

realistic; and (c) real-time facial damage such that bruising and black eyes remain throughout the game.

347.   *NHL 14* producer Sean Ramjagsingh told the *Canadian Press* in an interview: "it was all about capturing the big hits, real fights and unbelievable speed and skill of hockey."   Ramjagsingh said: "When I look back at *NHL 13*, I feel like we fell short a little bit on the aggression piece of it."

348.   Most recently, the NHL's view on violence in hockey took center stage during the U.S. House of Representatives Committee on Energy and Commerce on concussions in sports.   Specifically, during the hearing on March 13, 2014, NHL Deputy Commissioner Daly testified that "fighting remains a small part of our game," stating:

> [O]ur fans—who continue to attend our games in new record numbers almost every year (at least 20 million in attendance in every full season since the turn of the century)—want [the game] to be physical.

349.   According to Deputy Commissioner Daly:

> The role of fighting continues to be a hot topic in our game and one which engenders a broad spectrum of opinions and debate.   As a League, we continue to search for a consensus as to how best to serve the interests of all constituent groups in the game on the issue—including our fans, our teams, and our Players.   To this point, that consensus has proved elusive, including with and as among our Players.

350.   As demonstrated above, for nearly a century, the NHL has failed to supply its players with full, accurate information about the risks of head trauma because it has continued to profit handsomely from its culture of violence, notwithstanding the brain injuries inflicted on NHL players.   Through its savvy media outlets, the NHL is able to promote the most violent aspects of the NHL and urge players at every level of the game to

remain uninformed about the true risks of violent head impacts. The NHL has created a culture in which the "toughest" players are glorified—and maintain job security—for their ability to dish out and endure severe violence on the ice.

351. Moreover, when players did report violent head impacts that rendered them unable to play, the NHL punished them by demoting them to the minors, which resulted in pay cuts. Due to these retributory actions, the NHL created an environment for its players where they felt forced to continue playing after suffering serious injuries, or risk losing their roster spot on an NHL team.

352. Within this culture, the NHL purposefully profits from the brutality and violence it promotes. This attitude has existed for decades and continues to the present day, with players lauded for their body checking, fighting skills, and "toughness" for playing through concussions.

## C.   Despite Its Knowledge the NHL Downplayed the Risks of Head Trauma

353. At all relevant times, the NHL's unique historical vantage point at the apex of the sport of hockey, paired with its unmatched resources as the most well-funded organization devoted to the business of the game, has afforded it unparalleled access to data relating the effect of head impacts on its players and made it an institutional repository of accumulated knowledge about head injuries to players. As set forth above, the NHL has trumpeted its role in educating players on these issues and taking care of their safety.

354. From its inception, the NHL unilaterally assumed the role of protecting players and informing players of safety concerns. From the beginning, the NHL held itself out and acted as the guardian of the players' best interests on health and safety issues.

355.    However, the NHL has made, and continues to make, many statements inaccurately downplaying the risks of head trauma and fighting, and denying the need for reform to decrease those risks.   Not only has the NHL concealed facts about concussions, but also it has downplayed the head and brain injury risks of the violent aspects of the game, including fist-fighting.

356.    For example, in response to proposed legislation in 1980 to curb violence in professional supports (The Sports Violence Act of 1980), then NHL President Zeigler was quoted by a Canadian media outlet as stating at a subcommittee hearing that "under the present laws in the United States and in the provinces of Canada, people charged with refereeing the sports seem to have done a responsible job."   Ziegler was also quoted as stating that the NHL "didn't need the federal government to interfere."

357.    And in a 2007 press conference, Commissioner Bettman acknowledged that the topic of fighting is "something we need to look at," but callously underscored that "[f]ighting has always had a role in the game" and "*we're not looking to have a debate on whether fighting is good or bad or should be part of the game*."   The comments were in response to a series of fighting incidents, including one on March 21, 2007, when Colton Orr of the New York Rangers fought with Todd Fedoruk of the Philadelphia Flyers and ended up knocking Fedoruk unconscious.

358.    Indeed, as late as 2011, Commissioner Bettman said of fighting:   "*Maybe it is [dangerous] and maybe it's not. You don't know that for a fact* and it's something we continue to monitor."   Bettman said it is premature to draw a connection between fighting in hockey and CTE.   The remarks were made in response to questions about the deaths of

three former NHL players in 2011 who were prominent fighters, and a *New York Times* article discussing the link between fighting and CTE.  Bettman said he thought "in this whole area there is probably entirely too much speculation and rumors."  He then defended the inclusion of fighting in hockey for profit's sake, saying "[o]ur fans tell us that they like the level of physicality in our game."  He further explained "people need to take a deep breath and not overreact" and not "over-conclude when the data isn't there yet."

## IV. WHILE PROMOTING A CULTURE OF VIOLENCE BY WHICH IT PROFITS AND DOWNPLAYING RISKS, THE NHL VOLUNTARILY UNDERTOOK A DUTY OF CARE TO ITS PLAYERS

359.    For decades, the NHL undertook and repeatedly confirmed a duty of care to its players, rooted in the NHL's knowledge that the NHL had vastly superior managerial, medical, legal, and other resources to gather, analyze, and understand concussion and head injury data than the Plaintiff players did.

360.    The NHL's duty of care to the players was also rooted in the NHL's vastly superior ability to gather, analyze, and understand the correlation between, for example, the speed of playing surfaces, board and glass configurations, turnbuckle locations, playing rules and enforcement of rules, distances between lines, distances between goal lines and end boards, size and player position, on the one hand, and, on the other hand, the frequency, severity, and duration of concussions and other head injuries.

361.    With its pronouncements about player safety in general, and concussions and head injuries in particular, the NHL confirmed to the players that the NHL was undertaking to protect them, to take all reasonable steps to maximize their safety.

362.    As a result, the players, medically untrained and often not exposed to post-high school education, reasonably relied on what the NHL said and did not say to players about concussions and other head injuries.

363.    The NHL always knew that the players lacked the injury data that the NHL receives from every team after every game.

364.    The NHL always knew that the players lacked specialized medical, statistical, and other training—which the League did have—necessary to analyze and understand correlations between concussion and head injury causal factors and the frequency, severity, and duration of resulting concussions and head injuries.

365.    The NHL knew that players—by upbringing, by training in organized hockey from mites to major juniors, from high school to college, from minor professional leagues to the NHL—trusted and relied on League personnel and League-approved medical personnel, trainers, and coaches to provide them with information important to their health and well-being.

366.    The team-first, individual-last culture of hockey players, not only well-documented but also extremely well-known, constantly discussed in the media, rendered the Plaintiffs especially susceptible to trusting and uncritical reliance on the NHL's statements and silences about concussions, MTBI, and other head injuries.

367.    In a number of ways the NHL communicated to the players that they were not at risk of long-term brain and neurocognitive injury from concussions and other head injuries.   These include, for example:

(a) promoting fighting, especially staged fights, of the sort engaged in by Derek Boogaard, Wade Belak, Rick Rypien, and Bob Probert—all now dead, all of whom had degenerative brain disease;

(b) having players continue their careers even after inflicting career-ending concussive damage to competitors, such as the one Vancouver's Todd Bertuzzi did to Colorado's Steve Moore on March 8, 2004;

(c) calibrating player discipline for head hits to the existence and severity of resulting injury, as the NHL's former Vice President for Player Safety, Brendan Shanahan admitted doing;

(d) returning players to play in games in which they had been concussed, even knocked cold, as Gilles Gratton did in a game against the Boston Bruins in 1976-1977;

(e) returning players to play after concussive and other head injuries without any medical evaluation or subsequent waiting period;

(f) by never warning the players that they might be developing CTE and should be checked for symptoms to ensure that they understood that continued playing might expose them to irreversible brain damage and neurocognitive impairment;

(g) by never warning the players that studies of football players and boxers, and others of the sort described herein, were applicable to NHL players;

(h) by avoiding any proper study of concussions and other head injuries and developing rules and protocols for disclosing risks and minimizing their occurrence.

368. The NHL assumed the duty to make the game of professional hockey safer for the players and to keep the players informed of safety information, particularly about concussions and head injuries, that players needed to know.   The NHL has admitted that it has "always" assumed the duty to care for player safety.   Deputy Commissioner Daly has

publicly stated, "[The NHL is] completely satisfied with the responsible manner in which the league and the players' association have **managed player safety over time, including with respect to head injuries and concussions**....This is something that we have **always** treated as important and will continue to treat as important."

369.    Likewise, David Poile, general manager of the Nashville Predators, has commented "It's the game of hockey, it's going to be physical.   As the caretakers we're going to do everything possible to make it as safe as possible, but there are still going to be injuries."

370.    The NHL has far greater ability than individual players, and uses that ability, to collect and analyze concussion and head injury data—cause, effect, type, severity, location, and other specific factors—treatment options and related information.

371.    The NHL has long recognized its much greater ability to collect, analyze, and disseminate the results of concussion and head injury data for purposes of player protection.   As NHL Executive Vice President Colin Campbell said, discussing concussions: "It's something that we're concerned about, always have been concerned about."

372.    The NHL has long recognized its power to reduce concussions and head injuries through its power to fine and suspend players.   "The league has told players they will be subject to fines and suspension for hits deemed dangerous during post-game video reviews."

373.    Receiving injury reports from NHL member teams and communicating with NHL member teams, seeing press reports and team press releases about injuries, the NHL

knew or should have known the reported rate of concussions in the NHL for every year of the class period.

374.    However, with its personnel frequenting NHL team locker rooms, its numerous meetings with players both in and outside of the season, in disciplinary and informational settings, its ready access to team personnel, including team doctors and trainers, and its supervision and control of the NHL disciplinary program through the NHL Office of Player Safety, staffed by NHL personnel, including, most recently, Brendan Shanahan and Stephane Quintal, the NHL knew, or should have known, that, as stated by Dr. Karen Johnston, director of the Concussion Clinic at Toronto Rehabilitation Institute and who has "treated a number of NHL players with concussions:  'No matter what the numbers [of] concussions are in the newspaper, they're much larger than what's reported….Concussions are vastly underreported.'"

375.    For decades, the NHL's players and their families reasonably relied on and looked to Defendant, which had publicly undertaken to promote player health and safety, for guidance on these issues and to intervene in matters of player safety, to recognize issues of player safety, and to be truthful on the issue of player safety.

376.    Since its inception, the NHL received and paid for advice from medical consultants regarding health risks associated with playing hockey, including the health risks associated with concussive and sub-concussive injuries.  Such ongoing medical advice and knowledge placed the NHL in a position of superior knowledge to the players.

377.    Combined with Defendant's heavy influence over the game, Defendant at all relevant times was in a position to influence and dictate how the game would be played and to define the risks to which players would be exposed.

378.    As a result, Defendant assumed a duty of care to the Plaintiffs, to avoid conduct detrimental to the health and safety of NHL players, to provide truthful and complete information to NHL players regarding risks to their health, and to take all reasonable steps necessary to ensure the safety of players.

379.    Despite their voluntarily assumed duty of care and power to govern player conduct on and off the ice, the NHL for decades ignored, turned a blind eye to, and actively concealed the risks to players of repetitive sub-concussive and concussive head impacts, which can and do result in players being knocked unconscious or having "their bell rung" so that they are in a conscious but disoriented state.

## V.    INSTEAD OF PROTECTING ITS PLAYERS, THE NHL SAT ON THE BENCH FOR ANOTHER 14 YEARS WHILE THE EVIDENCE KEPT MOUNTING

### A.    The Concussion Program Report Produced Nothing Until 2011

380.    Rather than exercise reasonable care in fulfilling its voluntarily assumed duty of care to its players, the NHL pursued a long-running course of fraudulent and negligent conduct to maintain and improve its economic advantage, which included failing to make any statements of substance about concussions, MTBI, and other head injuries.

381.    During the seven years of the Concussion Program report's 1997-2004 data gathering, and the seven years after that before the report was finally published in May

2011, the NHL never disclaimed, directly or indirectly, the duty of care it had historically and continuously adopted toward its players.

382.    The NHL's seven-year silence from 1997-2004 about concussions and the Concussion Program's data, and the NHL's seven-year delay, until 2011, in publishing the Program's results—which boiled down to "we need more information"—further justified the Plaintiffs in relying on the NHL.   If the League had any information that players were at risk of developing brain deficits and neurocognitive impairments, the existence of the study confirmed for players that the League would tell them if any information was important.

383.    All of the Plaintiffs relied on the NHL for information about concussions, other head injuries, and the short- and long-term risks of both, including information about when returning to play was safe and when it was not.

384.    Delaying for some seven years the publication of a report from the Concussion Program that did not mention MTBI and was designed to ignore accepted and valid neuroscience regarding the connection between repetitive traumatic concussive events, sub-concussive events and/or brain injuries, and degenerative brain disease such as CTE only confirmed and reinforced a climate of silence by which the NHL implied, and Plaintiffs reasonably relied on the implication, that truthful and accepted neuroscience on the subject was inconclusive and subject to doubt.

385.    The NHL's supreme status in the world of hockey imbued its silence on the issue with a unique authoritativeness and as a highly reliable source of information to players.   Plaintiffs therefore reasonably relied on the NHL's silence on this vital health

issue as an indication that concussions either were not dangerous or were less dangerous than they in fact are.

386.    To date, the Concussion Program has taken no public position on the long-term effects of concussions.  The NHL continues to respond to inquiries on the subject by saying that further research is required.

387.    Putting aside the fact that NHL players were not informed of any of the findings from the 2011 report, the report still did nothing to educate players on the devastating impact of repeated head trauma, and, notwithstanding bodies of medical literature, that more study was still needed.

**B.    Between 1997 and 2011, the Concussions Just Kept Coming.**

388.    Between the time the NHL began its Concussion Program in 1997 and published its report in 2011, the NHL experienced increasingly devastating and highly publicized, career-ending concussions in its players.

389.    Both before and after the beginning of the NHL's Concussion Program in 1997, the NHL knew that fighting and concussions in the NHL were serious risks that could result in life altering consequences.  However, at least through 2011 and beyond, the NHL continued to withhold and suppress important and relevant information from its players, and the health and careers of the NHL's best players continued to be destroyed.

390.    Furthermore, while members of the NHL Concussion Study attended four conferences, the International Symposia on Concussions in Sport between 2001 and 2012, where the dangers of head and brain trauma in hockey and other sports were discussed and experts made recommendations to help reduce the risk of head and brain trauma, the NHL

did not disclose to its players what it learned at the conferences and did not follow the medical expert advice.

391.    After the Concussion Program began in 1997, the NHL continued to engage in a course of fraudulent and negligent conduct, which included failing to make any statements of substance on the issues of concussions and post-concussion syndrome in NHL players or any kind of brain trauma relevant to the sport of hockey, all the while claiming to need more data.

392.    The 2011 report generated by the Concussion Program, 14 years after its inception and seven years after the study was complete, simply concluded that the Concussion Study's "results suggest that more should be done to educate all involved with the sport about the potential adverse effects associated with continuing to play while symptomatic, failing to report symptoms to medical staff, and failure to recognize or evaluate any suspected concussion."

393.    While the 2011 report included certain basic safety information that should have been disclosed much earlier to players and others, there was much left out of the report.  The Concussion Program report:  (a) ignored the accepted and valid scientific research and studies regarding the connection between repetitive traumatic concussive events, sub-concussive events and/or brain injuries, and degenerative brain disease such as CTE; and (b) solidified the NHL's silence on the issue, which implied that truthful and accepted neuroscience on the subject was inconclusive and subject to doubt.

394.    Notably, the 2011 report did not take a position on the long-term effects of concussions, and did not provide any specific recommendations as to return to play

guidelines.   Nor did the report include any analysis of the causes of concussions, such as fighting and equipment.

## VI.   NHL PLAYERS STILL FACE A RISK OF HEAD TRAUMA AND DEVASTATING LONG-TERM EFFECTS

### A.   The NHL Has Insufficiently and Ineffectively Protected Its Players

395.   On March 16, 2011, the NHL changed its concussion protocols to require an "off the ice and bench" examination by a doctor, rather than a trainer.   Previously, trainers performed these examinations on the bench or on the ice in the arena.   The NHL changed its concussion protocols to require an examination off the ice and bench, in a location referred to as a "quiet room," by a doctor—but this examining doctor need not be a neurosurgeon.   Under the guidance, an affected player could return to the ice if he was symptom free, returned to his brain baseline, and passed the SCAT2 test.   This was so, despite the fact that the general medical standard for return from concussion had been set as early as 2001, and by the Prague convention in 2004, as "when in doubt, sit them out"—a mandate to prevent a concussed player from returning to a game.

396.   Also in 2011, the NHL created a Department of Player Safety to look at rules that can better protect players.   The department focuses on safety issues related to players' equipment and the playing environment and administers supplemental player discipline.

397.   Following a number of incidents, on July 23, 2013, the NHL finally changed its concussion protocols to require that a concussed player not return to the same game in which the concussion occurred.

398.   To date, the NHL does not require a neurosurgeon to be available at its games.

399.   Many experts agree that the number of NHL concussions are still significantly under-reported.

## B.    The NHL Still Promotes Fighting and Violence

400.   The NHL's continuing callous indifference to the risks of concussions is exemplified in its reaction to the Max Pacioretty incident.

401.   In March 2011, Max Pacioretty was hospitalized with a severe concussion and fractured vertebra after the Montreal forward was slammed into a stanchion holding the glass at the Bell Centre in Montreal on a vicious hit by Zdeno Chara of the Boston Bruins, the League's biggest player.

402.   Pacioretty's team, the Montreal Canadiens, criticized the NHL's decision not to suspend Chara, calling the decision "a hard blow" and expressing "frustration, disappointment and shock" over the issue.   The NHL team stressed the "urgency" of addressing head injuries and player safety in hockey:

> Our organization believes that the players' safety in hockey has become a major concern, and that this situation has reached a point of urgency.   At risk are some of the greatest professional athletes in the world, our fan base and the health of our sport at all levels.   Players' safety in hockey must become the ultimate priority and the situation must be addressed immediately.

403.   The NHL was defiant and dismissive of the deep concern shared by the Canadian government, NHL's sponsors, NHL players, and an NHL franchise. Commissioner Bettman, testifying at a congressional hearing later that week and discussing it afterward, boasted that the NHL was "extraordinarily comfortable" with its decision not to suspend the offending player, taking the incongruous position that further

discipline would not deter future vicious hits: "It was a horrific injury, we're sorry that it happened in our fast-paced physical game, but I don't think whether or not supplemental discipline was imposed would change what happened."

404.    In response to calls in congress to legislate stricter protections for players after the horrific injury to Max Pacioretty in 2011, Commissioner Bettman flatly said there is no need to "over-legislate" head hits.   While Bettman acknowledged that concussions were on the rise, he inaccurately tried to explain this away as the result of "accident events" and "not from head hits."   In fact, a recent study showed that only 4.9% of concussions during this time period were the result of unintentional contact.

### C.    The NHL Has No Good Excuse for Its Failure to Act, Which Has Harmed Its Players

405.    In 2008, Boston University's Dr. Ann McKee (who performed the Reg Fleming autopsy in 2010) stated that "the easiest way to decrease the incidence of CTE [in contact sport athletes] is to decrease the number of concussions."   Dr. McKee further noted that "[t]here is overwhelming evidence that [CTE] is the result of repeated sub-lethal brain trauma."

406.    Why the NHL (and its Concussion Program) failed to share material information and take appropriate actions can be chalked up, at worst, to intentional wrongdoing and, at best, to negligence, since the NHL has known or should have known for decades that multiple blows to the head can lead to long-term brain injury.   The NHL knew or should have known its players were retiring and dying due to concussions and sub-concussive blows to the head.   Fist-fighting does not just hurt the players involved in

the fight; it also creates a code of silence with respect to head injuries. The obvious expectation is that any player who is struck in the head should be tough enough to stay in the game regardless of how hard he is hit.

407. Notably, 64.2% of the reported, diagnosed concussions in a July 2013 report by Dr. Michael Cusimano were caused by body checking. Only 28% of the reported concussions in the report resulted in a called penalty. A legal body check to another player's body can still result in the checked player's head hitting the ice, boards, or glass, resulting in a concussion.

408. On August 21, 2013, 66% of the delegates at the Canadian Medical Association meeting in Calgary voted to "condemn the complacency of the NHL in regards to violence in hockey."

409. The concussive and sub-concussive blows suffered by Plaintiffs and the Class in their capacity as NHL players caused twisting, shearing, and stretching of neuronal cells, and in turn caused the release of Tau protein, which accumulates in the brain over time, and thus caused changes and damage within their brains on a cellular level. These present, cellular injuries have increased Plaintiffs' risk of further neurodegenerative disorders and diseases, including but not limited to CTE, dementia, Alzheimer's disease, and similar cognitive-impairing conditions, beyond that level of risk observed in the average person.

## CLASS ACTION ALLEGATIONS

410.    Plaintiffs Simon, Ahern, Anderson, Andrea, Bennett, Daniels, Harris, Holt, Krulicki, Latendresse, Norwich and Pesut bring their claims on their own behalf and on behalf of the following **Class**:

> All living NHL hockey players, their spouses and dependents, and the estates of deceased NHL players, who retired, formally or informally, from playing professional hockey with the NHL or any member club, who suffered a concussion or repeated, sub-concussive blows while playing on an NHL active roster.

411.    This action is properly maintainable as a class action under Rule 23 of the Federal Rules of Civil Procedure.

412.    The Class is so numerous that joinder of all members is impracticable. Upon information and belief, there are thousands of members of the proposed Class throughout the United States, Canada, and elsewhere around the world.

413.    There are questions of law and fact which are common to the Class.  The common questions, which are each separate issues that should be certified for class wide resolution pursuant to Fed. R. Civ. P. 23(c)(4), include, *inter alia*, the following:

(a)    whether the NHL owed a duty of care to the Class;

(b)    whether the NHL's duty of care to the class included the duty to warn and protect the Class of the risks and consequences of head trauma;

(c)    whether the NHL breached its duty to warn and protect the Class of the risks and consequences of head trauma;

(d)    whether concussion and sub-concussive blows commonly experienced in NHL hockey cause the signature injuries claimed herein;

(e)    whether the suffering of a concussive or sub-concussive blow results in a present injury;

(f)    whether the NHL should be required to pay for medical monitoring of the Class; and

(g)    whether the NFL should be required to pay for the increased health care costs, and loss of earnings, and lost enjoyment of life costs of the Class.

414.    Plaintiffs' claims are typical of the claims of the other members of the Class and Plaintiffs do not have any interests adverse to the Class. Each of the Plaintiffs suffered one or more concussions while playing in the NHL, were not warned of the long-term risks associated with the same, including the risk of developing neuro-degenerative diseases, and currently suffers from the negative effects of those concussions at a cellular level.

415.    Plaintiffs are adequate representatives of the Class, and have retained competent counsel experienced in litigation of this nature and will fairly and adequately protect the interests of the Class.

416.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class.

417.    Plaintiffs anticipate that there will be no difficulty in the management of this litigation. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

418.    The NHL acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

419.    In addition, certification of specific issues such as Defendant's liability is appropriate.

## BASES FOR RELIEF

### COUNT I

### Action for Declaratory Relief – Liability

420.    Plaintiffs reallege the foregoing paragraphs as if fully set forth herein.

421.    There is an active case and controversy among Plaintiffs and the Class on the one hand, and the NHL on the other.

422.    Pursuant to 28 U.S.C. §2201, Plaintiffs seek a declaration as to the following:

a.    That the NHL knew or reasonably should have known, at all material times, that the repeated, traumatic, and unnecessary head impacts that the Plaintiffs and members of the Class endured while playing hockey in the NHL were likely to expose them to substantially-increased risks of neurodegenerative disorders and diseases, including but not limited to CTE, Alzheimer's disease, and similar cognitive-impairing conditions;

b.    That based on the NHL's conduct in, *inter alia*, voluntary undertaking to study the issue of MTBI, the NHL had a duty to advise Plaintiffs and members of the Class of the heightened risk;

c.    That the NHL willfully and intentionally concealed material information from and misled Plaintiffs concerning that risk; and

d.    That the NHL recklessly endangered Plaintiffs and members of the Class.

423.    Plaintiffs are currently at an increased risk of developing serious latent neurodegenerative disorders and diseases including but not limited to CTE, dementia, Alzheimer's disease, or similar cognitive-impairing conditions.  As such, a declaratory judgment is warranted to prevent future harm to Plaintiffs and the Class.

## COUNT II

## Medical Monitoring

424.    Plaintiffs re-allege the foregoing paragraphs as if fully set forth herein.

425.    During their respective NHL playing careers, Plaintiffs and members of the Class experienced head injuries, concussions, sub-concussive blows, and/or a combination thereof with greater frequency and severity than the general population of men of a similar age.

426.    These repeated traumatic head impact injuries, including sub-concussive blows and concussions, experienced by Plaintiffs and members of the Class during their respective NHL careers are known and proven to be hazardous because they caused present, cellular injuries that, in turn, increase the latent risk of neurodegenerative disorders and diseases, including but not limited to dementia, Alzheimer's disease, CTE, and similar cognitive-impairing conditions.   Each concussive or sub-concussive blow constitutes a cellular injury.

427.    Plaintiffs and members of the Class were exposed to a significant number of sub-concussive blows and concussions as a result of their professional hockey careers. The general public does not experience this type of brain trauma absent extraordinary circumstances.

428.    Defendant was fully aware of yet concealed and misrepresented the dangers of exposing players, including Plaintiffs and members of the Class, to repeated traumatic head impacts and increased risks of latent but long-term, debilitating chronic illness, including developing neurodegenerative disorders and diseases.   To that end, brain injury

and brain disease in NHL retirees is a latent disease that can appear years or decades after the player experiences head trauma in his NHL career.

429. Defendant's fraudulent concealment, omissions of material fact, and negligent misrepresentations as to the risks of chronic sub-concussive blows and concussions have caused Plaintiffs and the Class's present injuries, which have increased the risks for members of the Class to brain injury and its sequelae, including cognitive, mental, and neurological disorders after retirement.

430. Absent Defendant's negligence, fraud, breach of duties, and/or misrepresentations, the head impacts to which Plaintiffs and members of the Class were exposed, and the resulting risk to Plaintiffs and members of the Class—that harmful substances, including the Tau protein, would be released into their brains—would have been materially lower or zero.

431. Serial testing of cognitive functioning for early signs or symptoms of neurologic dysfunction, and serial brain imaging for signs of injury or disease, is medically necessary to assure early diagnosis and effective treatment of brain injury.

432. Monitoring procedures exist that comport with contemporary scientific principles and make possible early detection of the cognitive impairments and conditions that Plaintiffs and members of the Class are at increased risks of developing. Such monitoring, which includes but is not limited to baseline exams, diagnostic exams, and behavioral and pharmaceutical interventions, will prevent or mitigate the injuries, and enable treatment of the adverse consequences of the latent neurodegenerative disorders and diseases associated with the repeated traumatic head impacts described herein.

433.    Such medical monitoring for latent brain injury is highly specialized and different from the medical care that is normally recommended to other men of a similar age, in the absence of a history of chronic repeated sub-concussive impacts and concussions.

434.    For sports such as NHL hockey, in which repeated blows to the head have been common, proper concussion assessment and management is paramount for preventing and mitigating long-term consequences.

435.    Defendant was fully aware of the danger of exposing their players to injury and further risk of injury by encouraging them to play with these injuries or to play prior to the time that such injuries could heal.   Defendant failed to warn players of these medical risks, and instead attempted to conceal the harmful effects of hockey-related concussions from players.   Furthermore, Defendant breached its duties of reasonable and ordinary care to the Plaintiffs and members of the Class by failing to protect their physical and mental health and failing to provide adequate information.

436.    As a proximate result of Defendant's misconduct, Plaintiffs and members of the Class have experienced injuries and an increased risk of developing serious, latent, neurodegenerative disorders and diseases including but not limited to CTE, dementia, Alzheimer's disease, or similar cognitive-impairing conditions.

437.    As a direct result of the NHL's actions, Plaintiffs and the Class are in need of the costly medical monitoring procedures described herein.   Specifically, the monitoring procedures are reasonably necessary, according to contemporary scientific principles, to enable Plaintiffs and members of the Class to obtain early detection and diagnosis of the

cognitive impairments and conditions that they are at increased risks of developing as a result of Defendant's tortious conduct described herein.

438.    Plaintiffs and members of the Class seek the creation and funding of a Court-supervised, NHL-funded medical monitoring regime, which will provide for facilitating prevention, early diagnosis, adequate treatment, management, and rehabilitation in the event a neurodegenerative disorder or disease is diagnosed.

439.    Plaintiffs and the members of the Class have no adequate remedy at law in that monetary damages alone cannot compensate them for their injuries and the risks of long-term physical and economic losses due to concussions and sub-concussive injuries. Without a Court-approved medical monitoring program as described herein, Plaintiffs and the members of the Class will continue to face an unreasonable risk of injury, disability and harm.

440.    Plaintiffs and members of the Class also seek all other available and necessary relief in connection with this claim.

## COUNT III

### Negligence

441.    Plaintiffs re-allege the foregoing paragraphs as if fully set forth herein.

442.    The NHL has historically and voluntarily assumed an independent tort duty of reasonable care regarding player safety and head trauma.   The NHL has admitted that it has "always" assumed the duty to manage player safety, particularly with regard to head injuries and concussions.   It was thus obligated to discharge this duty non-negligently.

443.    Defendant also had a duty of reasonable care to act in the best interests of the health and safety of NHL players, to provide truthful information to NHL players regarding risks to their health, and to take all reasonable steps necessary to ensure the safety of players.

444.    As part of this duty of reasonable care, the NHL was required to keep NHL players informed of neurological risks of head injuries suffered while playing hockey in the NHL, and not to omit material information about the risks of negative long-term effects or permanent neurological damage that can occur from head injuries incurred while playing hockey.

445.    The NHL breached that duty of reasonable care to its players by:

(i)    creating, fostering, and promoting a culture of extreme violence, including head hits and violence from fighting, where head trauma to Plaintiffs was a natural and common corollary;

(j)    by failing to inform Plaintiffs about the scientific research on the negative health effects of head trauma and about anecdotal evidence from the negative health effects of head trauma from its own NHL players;

(k)    failing to warn players of the potential negative effects of head injuries suffered while playing in the NHL, including but not limited to that they might be developing CTE and should be checked for symptoms to ensure that they understood that continued playing might expose them to irreversible brain damage and neuro-cognitive impairment;

(l)    failing to adequately address the continuing health risks associated with concussive events, sub-concussive events, and/or brain injuries that the NHL players sustained;

(m)    failing to make any statements of substance about concussions, MTBI, and/or other head injuries;

(n)    turning a blind eye to the risks to players of repetitive sub-concussive and concussive head impacts, and

(o)    by avoiding any proper study of concussions and other head injuries.

446.    As a result of the NHL's breach of its duty of reasonable care, Plaintiffs have suffered/are suffering injury, including but not limited to long-term neurological damage, and the serious symptoms and disorders resulting from that damage.

447.    The NHL's failure to exercise reasonable care in the execution of its duties proximately caused the injuries suffered by Plaintiffs.

448.    As a direct and proximate result of the NHL's negligence, the NHL is liable to Plaintiffs for, and Plaintiffs seek, the full measure of damages allowed under applicable law.

## COUNT IV

## Negligent Misrepresentation by Omission

449.    Plaintiffs re-allege the foregoing paragraphs as if fully set forth herein.

450.    A special relationship exists between the NHL and the Plaintiffs sufficient to impose a duty on the NHL to disclose accurate information to the Plaintiffs.  This duty arose because: (1) the NHL had superior special knowledge of material medical information that players did not have access to, and was not readily available to players; and (2) the NHL communicated with players and the public, completely omitting material information about the true risks of head trauma, or providing partial or ambiguous statements regarding safety and head injuries, and the context of those communications shows that the NHL needed to complete or clarify those statements with all material information.

451.    Despite its knowledge of such material facts, and generally speaking about concussions and head injuries, the NHL negligently omitted to disclose material information to its players regarding the link between head injuries suffered while playing in the NHL and the resulting negative effects and cognition-impairing conditions.

452.    The NHL actively omitted true information at a time when they knew, or should have known because of their superior position of knowledge, that Plaintiffs faced serious health problems if they returned to a game too soon after sustaining a concussion.

453.    Plaintiffs justifiably relied on the NHL's negligent misrepresentations by omission to their detriment, relying on what the NHL said and failed to say to players about concussions and other head injuries.

454.    Plaintiffs' reliance on the NHL's negligent misrepresentations by omission was reasonable, given the NHL's superior and unique vantage point on these issues.

455.    Had Plaintiffs been aware of such information, they would have ensured that they received appropriate medical treatment and ensured that they were completely healthy and their brains had completely healed before returning to play.

456.    The NHL failed to act with reasonable care by negligently omitting to disclose material information to its players and former players regarding the link between concussions and brain injury and resulting negative effects and cognition-impairing conditions.

457.    As a direct and proximate result of the NHL's negligent misrepresentation by omission, Plaintiffs have suffered and continue to suffer serious injuries, including but not

limited to long-term neurological damage, and the serious symptoms and disorders resulting from that damage.

458.    As a result of the NHL's misconduct, the NHL is liable to Plaintiffs for, and Plaintiffs seek, the full measure of damages allowed under applicable law.

## COUNT V

### Fraudulent Concealment

459.    Plaintiffs re-allege the foregoing paragraphs as if fully set forth herein.

460.    The NHL knowingly and fraudulently concealed from Plaintiffs material information regarding the risks of head injuries suffered while playing in the NHL, including but not limited to the link between concussions and brain injury and resulting negative effects and cognition-impairing conditions, and the risks that they might be developing CTE and should be checked for symptoms to ensure that they understood that continued playing might expose them to irreversible brain damage and neuro-cognitive impairment.

461.    The NHL knew, intended to induce, and expected that Plaintiffs would reasonably rely on their silence and fraudulent concealment of the risks and long-term effects of head injuries suffered while playing in the NHL.

462.    Plaintiffs reasonably relied on that silence during and after their careers, to their detriment.

463.    The NHL's actions and/or omissions were committed willfully, maliciously, with intent to injure and damage the Plaintiffs, and with reckless disregard of the players'

health and safety, in order to keep players in the dark about the dangers of concussions, MTBI, and other head injuries.

464.    Had Plaintiffs been aware of such information, they would have ensured that they received appropriate medical treatment and ensured that they were completely healthy and their brains had completely healed before returning to play.

465.    As a direct and proximate result of the NHL's fraudulent concealment, Plaintiffs have suffered and continue to suffer serious injuries, including but not limited to long-term neurological damage, and the serious symptoms and disorders resulting from that damage.

466.    As a result of the NHL's misconduct as alleged herein, the NHL is liable to Plaintiffs for, and Plaintiffs seek, the full measure of damages allowed under applicable law.

## COUNT VI

### Fraud by Omission / Failure to Warn

467.    Plaintiffs re-allege the foregoing paragraphs as if fully set forth herein.

468.    The NHL had a duty to promptly disclose and speak the full truth regarding the health risks caused by concussion and sub-concussive blows to the head.  This duty arose because: (1) the NHL had superior special knowledge of material medical information that players did not have access to, and was not readily available to players; and (2) the NHL communicated with players and the public, completely omitting material information about the true risks of head trauma, or providing partial or ambiguous statements regarding safety and head injuries, and the context of those communications

shows that the NHL needed to complete or clarify those statements with all material information.

469.    The NHL breached that duty by fraudulently failing to disclose material information to Plaintiffs regarding the risks of head injuries suffered while playing in the NHL, including but not limited to the link between concussions and brain injury and resulting negative effects and cognition-impairing conditions, and the risks that they might be developing CTE and should be checked for symptoms to ensure that they understood that continued playing might expose them to irreversible brain damage and neurocognitive impairment.

470.    Specifically, the NHL concealed material facts and information with the intent to evade the truth, which caused Plaintiffs to become exposed to the harm referenced above.

471.    Plaintiffs justifiably relied on the NHL's fraudulent omissions, to their detriment.

472.    Given the NHL's superior and special knowledge and resources, Plaintiffs reasonably relied upon the NHL for guidance on head injuries and concussions, and reasonably relied upon the NHL's fraudulent omissions of material fact, which concealed and minimized the perceived risks of repetitive brain impacts that players suffered while playing in the NHL.

473.    Had Plaintiffs been aware of such information, they would have ensured that they received appropriate medical treatment and ensured that they were completely healthy and their brains had completely healed before returning to play.

474. As a direct and proximate result of the NHL's fraud by omission and failure to warn, Plaintiffs have suffered and continue to suffer serious injuries, including but not limited to long-term neurological damage, and the serious symptoms and disorders resulting from that damage.

475. As a result of the NHL's misconduct, the NHL is liable to Plaintiffs for, and Plaintiffs seek, the full measure of damages allowed under applicable law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment with respect to their Complaint as follows:

1.   Certifying the Class and Subclasses as defined herein;

2.   With respect to Count I, granting the declaratory relief requested pursuant to 28 U.S.C. § 2201 against Defendant;

3.   With respect to Count II, granting medical monitoring to all members of the Medical Monitoring Subclass;

4.   Counts III through VI, granting compensatory and all other damages allowed by law;

5.   With respect to all counts, awarding Plaintiffs their costs and disbursements in this action, including reasonable attorneys' fees, to the extent permitted by law; and

6.   With respect to all counts, granting Plaintiffs all other relief allowable at law or equity.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues so triable.

Dated:   May 12, 2017

*s/ Brian C. Gudmundson*
Charles S. Zimmerman, MN Bar No. 0120054
Brian C. Gudmundson, MN Bar No. 0336695
David M. Cialkowski, MN Bar No. 0306526

**ZIMMERMAN REED LLP**
1100 IDS Center, 80 S. 8th Street
Minneapolis, MN 55402
Telephone: (612) 341-0400
charles.zimmerman@zimmreed.com
brian.gudmundson@zimmreed.com
david.cialkowski@zimmreed.com

Robert K Shelquist, MN Bar No. 21310X
Rebecca A. Peterson, MN Bar No. 0392663
**LOCKRIDGE GRINDAL NAUEN, PLLP**
100 Washington Ave S, Suite 2200
Minneapolis, MN 55401-2179
Telephone: (612) 339-6900
rkshelquist@locklaw.com
rapeterson@locklaw.com

Stuart A. Davidson (FL Bar #84824)
Mark J. Dearman (FL Bar #982407)
Kathleen B. Douglas (FL Bar #43240)
Alexander D. Kruzyk (FL Bar # 112052)
**ROBBINS GELLER RUDMAN
    & DOWD LLP**
120 E Palmetto Park Road
Boca Raton, FL 33432
Telephone: (561) 750-3000
sdavidson@rgrdlaw.com
mdearman@rgrdlaw.com
kdouglas@rgrdlaw.com
jarno@rgrdlaw.com

Steven D. Silverman (MD Bar #22887)
Stephen G. Grygiel (MD Bar #09169)
William Sinclair (MD Bar #28833)
**SILVERMAN, THOMPSON,
SLUTKIN & WHITE, LLC**
201 N Charles Street, Suite 2600
Baltimore, MD 21201
Telephone: (410) 385-2225
ssilverman@mdattorney.com
sgrygiel@mdattorney.com
bsinclair@mdattorney.com

Thomas Demetrio (ARDC #611506)
William T. Gibbs (ARDC #6282949)
**CORBOY & DEMETRIO**
33 N Dearborn Street
Chicago, IL 60602
Telephone: (312) 346-3191
tad@corboydemetrio.com
wtg@corboydemetrio.com

*Attorneys for Plaintiffs*